JOSEPH AHERN, Plaintiff-Appellee, v. JAMES M. KNECHT, Defendant-Appellant.

Second District   No. 2—89—1168

Opinion filed September 7, 1990.—Rehearing denied October 24, 1990.

Richard K. Wray and Robin R. LaFollette, both of Nathanson & Wray, and Keck, Mahin & Cate, both of Chicago, for appellant.

Joseph Ahern, of Hinsdale, appellee *pro se.*

Neil F. Hartigan, Attorney General, of Springfield (Gregory Condon, Assistant Attorney General, of Chicago, and Colleen McLaughlin, Assistant State's Attorney, of Wheaton, of counsel), *amicus curiae.*

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiff, Joseph Ahern, brought a small claims action to recover monies paid to defendant, James M. Knecht, for the repair of plaintiff's central air-conditioning unit. Plaintiff had paid $762 to defendant and complained that the unit was not repaired as requested, that defendant's charges were outrageously exorbitant, and that some services were neither requested nor necessary where another company had thoroughly serviced the unit the month before and another company was able to repair it for $72 the day after defendant had worked on the unit. Following a bench trial in which the parties appeared *pro se*, the trial court found that defendant should have charged $150 for his work, and after the court deducted $72, the amount paid to the subsequent repairman, defendant was allowed a total of $78 for his work. The trial court then entered judgment for plaintiff in the amount of $684.

Defendant appeals, contending that the trial court had no basis to rescind or set aside the terms of the contract, whether on the basis of common-law or statutory fraud, unconscionability, or duress. The Attorney General has been permitted to file a brief *amicus curiae* sup-

porting the position of plaintiff, who has filed his brief *pro se*. We believe that the record supports the judgment of the circuit court, and we, therefore, affirm.

The facts of this case have been gleaned from the limited stipulated statement of facts of the trial proceeding. At trial, plaintiff, Joseph Ahern, testified in his own behalf. Plaintiff began by describing another pending case in the chancery division of the trial court. He stated that defendant, James Knecht, was being sued by the Attorney General of the State of Illinois on behalf of about 100 people for violating the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (Ill. Rev. Stat. 1987, ch. 121½, par. 261 *et seq.*).

Plaintiff testified that Air Tite Temperature Engineering had performed service on the central air-conditioning unit on April 19, 1989. This included a new blower assembly and motor. Air Tite Engineering also performed service on the outside condensing unit on May 30, 1989. The service included washing out the condensing coils and levelling the unit.

Plaintiff testified that, on June 23, 1989, he was not home; the unit was running but not cooling properly. Mrs. Ahern called defendant, James Knecht, for service. Plaintiff complained that defendant and his helper evidently spent hours repeating the same work that was performed by Air Tite on April 19 and May 30, but failed to repair the cooling problem for which his services had been requested. Worse yet, the unit was not running at all when defendant left, and for his services he charged $762, a sum which plaintiff considered outrageously exorbitant. The next day, on June 24, Energy Exchange repaired the unit for $72, and it has functioned well since.

The trial court asked Celeste Ahern to recount the events of June 23 and 24. Mrs. Ahern testified that there was a heat wave on June 23. She awoke in the morning to find the house temperature quite warm even though the air-conditioning unit had been running all night. Her husband was not home, and she did not know what company he normally used to service the unit. So she consulted the "Yellow Pages" and picked defendant because his advertisement stressed "honesty."

Mrs. Ahern said that defendant arrived about 8:30 a.m. with a helper. They went to the basement and spent approximately 30 minutes down there. At 9 a.m., Mrs. Ahern went outside to find out when the unit would be repaired, since she had to leave for a doctor's appointment at 10:30 a.m. Defendant gave Mrs. Ahern a price of $643 to repair the unit. Mrs. Ahern testified that she was unfamiliar with

these mechanical procedures, but expressed shock at the price, particularly the $210 charge for levelling the unit. She presumed this was to have included a new concrete pad. She asked defendant to bill her, but he refused to do so and demanded to be paid before she left, despite the fact that the unit had still not been repaired. She testified that she felt intimidated and agreed to pay.

Mrs. Ahern testified that she returned with her checkbook 20 minutes later to discover that the slab had been levelled by shovelling some gravel from her patio under it. She expressed amazement to defendant that the $210 job had been performed so quickly. She testified that defendant then announced that he had forgotten to add $119 to his estimate to provide freon. She gave him a check for $762.

Mrs. Ahern testified that when she returned at 1 p.m., the unit was not running. Defendant left a note on his invoice which stated, "Weak compressor overload showed up." Mrs. Ahern immediately called the bank to stop payment on the check, but discovered that defendant had cashed it at 12:15 p.m. After repeated calls to defendant, he returned the call at 9 a.m. the next day. He explained that the compressor "died," and he would not replace it or refund the charges; he finally hung up on her.

Mrs. Ahern testified that the same day, June 24, Energy Exchange, Inc., serviced the unit and repaired it. Its invoice indicated that the run and start wires had been switched at the compressor. Freon was also added. Energy Exchange's total charge was $72, and the unit has cooled properly ever since.

Defendant, James Knecht, testified that, on June 23, 1989, he responded to a call from Mrs. Ahern. Defendant and his helper, Dale Jaffke, arrived at the Ahern home at 8:36 a.m.

Defendant testified that he followed a standard procedure in diagnosing and repairing central air-conditioning units. That procedure begins with an audit of the cooling system, including such items as the blower, which is generally located on the furnace, the thermostat, the air filters, the condensate drain, the electrical connections, and the coolant system.

As reflected on his invoice, defendant checked and oiled the furnace blower. He checked the air cleaner; he cleared out the condensate drain line; and he applied a coupler to that drain line for use in future service. He checked the outside unit, which was found to be working mechanically, but not cooling. In checking the outside unit, defendant observed that the slab on which the condenser unit was sitting was not level and had apparently settled to the point that the unit was suspended from the freon or coolant line. The result was

that the freon line had developed a leak.

At that point, as reflected in the invoice, defendant told Mrs. Ahern of his findings and gave her a quotation for the work which he felt was necessary to be done. As he told Mrs. Ahern, and as reflected on the invoice, the service call or travel charge of $69 combined with the $85 charge for diagnosing problems in the system totalled $154. Mrs. Ahern was told that Knecht Service would raise and level the condenser and slab for $210, that it would wet wash the condenser and coils for $138, check, clean, and tighten all electrical connections for $69, leak check eight service connections with a leak detection instrument, and stop the obvious leak at the condenser with a suction nut and seal cap for $72. Knecht Service would also install its instruments for monitoring coolant and add all required freon to bring the unit back up to service for $119. The total amount quoted to Mrs. Ahern was $762.

Mrs. Ahern told defendant that she needed to leave the house to attend to other business. Defendant told her that payment was required at the time the work was done. Mrs. Ahern agreed to prepare a check in the amount of $762, which she left with defendant.

Defendant and Jaffke proceeded to raise and level the concrete slab and condenser by adding several inches of landscaping gravel under the slab, sufficient to raise it so that pressure was relieved from the coolant line. Jaffke carried the gravel while defendant raised the slab and spread the gravel. Defendant and Jaffke disassembled the condenser and coils and proceeded to wet wash them using equipment from their service truck. All of the outdoor electrical connections were cleaned, tightened, and checked for continuity. The leak check of all service connections was accomplished using the leak detection equipment from the service truck.

Defendant and Jaffke then installed the instruments used in adding freon to the system and began adding freon. While the freon was being added, the compressor cut out and stopped working. According to defendant, it was not possible to complete the addition of freon once the compressor had stopped. Defendant attempted to determine the source of the failure, but he was unsuccessful in doing so. He left the invoice for Mrs. Ahern with the notation that an apparent compressor overload had occurred and that the compressor should be checked to see if it was under warranty.

Defendant subsequently learned from plaintiff that the problem with the compressor was that the "run" and "start" wires were attached to each other's terminals at the compressor. Defendant testified that those wires could have been improperly attached when he ar-

rived so that he did not notice them, or they may have been attached in error when he completed the checking, cleaning, and tightening of all of the electrical connections.

Defendant also testified that he had previously offered to return $72 to the Aherns which represented their cost of having another service man return to switch the two wires.

The trial court stated that the defendant should have charged $150 for the work that was done. The trial court stated that it would subtract the $72 paid to the subsequent repairman from the $150, with the result that defendant would be allowed a total of $78 for his work. Since Mrs. Ahern had paid $762, the trial court entered judgment in favor of plaintiff in the amount of $684 plus costs.

■■ Before addressing the merits of defendant's appellate contentions, we observe that the proceeding below was a small claims action, the rules governing such actions were designed to provide an expeditious, inexpensive and simplified procedure for handling such claims (*Ryan v. Bening* (1978), 66 Ill. App. 3d 127, 130.), and the trial court had jurisdiction to grant whatever remedy was appropriate under the circumstances of the case before it (*Van Walsen v. Blumenstock* (1978), 66 Ill. App. 3d 245, 250). The evidentiary record before us consists primarily of a brief summary of the testimony presented to the trial court rather than a verbatim record of that testimony. The defendant, as appellant, has the burden of presenting a sufficiently complete record of the proceedings of the trial court to support his claim of error, and any doubt arising as a result of the incompleteness of the record will be resolved against the appellant. *Capsonic Group v. Swick* (1989), 181 Ill. App. 3d 988, 992.

■■ We also observe that the weight to be given to testimony in a trial without a jury is a matter for the trial court, and its findings will not be disturbed on review unless they are palpably contrary to the manifest weight of the evidence. (*Wroclawski v. Waszczyk* (1976), 35 Ill. App. 3d 408, 412.) For a judgment to be against the manifest weight of the evidence, the appellant must present evidence so strong and convincing that it completely overcomes the evidence and presumptions, if any, existing in the appellee's favor. (*Wroclawski*, 35 Ill. App. 3d at 412.) We review defendant's claim of error keeping these principles in mind.

■■ Defendant raises three arguments in support of his contention that there is no basis to support the judgment of the trial court: (1) there was no basis to rescind an express contract either on the basis of common-law or statutory (consumer) fraud; (2) plaintiff could not set aside the contract as unconscionable or as violative of the Con-

sumer Fraud Act on the ground that the price was too high; and (3) there was no basis to rescind the contract on the ground of duress. As defendant failed to raise specifically any of these issues in the trial court, they are arguably waived on appeal. (*Randle v. Hinckley Parachute Center, Inc.* (1986), 141 Ill. App. 3d 660, 663.) The material attached to defendant's brief regarding a collateral proceeding involving defendant's violation of the Consumer Fraud Act is not properly before this court and will not be considered. (See *Kazubowski v. Kazubowski* (1970), 45 Ill. 2d 405, 415.) Inasmuch as defendant claims that there is no evidentiary basis in the record to sustain the judgment of the trial court, we will review his contention on that basis in view of the informality of the proceedings below. (See *Gulf, Mobile & Ohio R.R. Co. v. Edwards* (1969), 108 Ill. App. 2d 295, 298.) As a reviewing court, we can sustain the decision of the trial court on any grounds which are called for by the record regardless of whether the circuit court's reasoning was correct. *Bell v. Louisville & Nashville R.R. Co.* (1985), 106 Ill. 2d 135, 148.

■ Because plaintiff complained that defendant's prices were outrageously exorbitant in relation to the value of the services received, our examination of the evidence focuses first on the adequacy of consideration to support the contract. Consideration is any act or promise which is of benefit to one party or disadvantageous to the other. (*O'Neill v. De Laney* (1980), 92 Ill. App. 3d 292, 297.) Generally, courts will not inquire into the sufficiency of the consideration to support a contract. (*Sta-Ru Corp. v. Mahin* (1976), 64 Ill. 2d 330, 338.) However, where the amount of consideration is so grossly inadequate as to shock the conscience of the court, the contract will fail. *O'Neill*, 92 Ill. App. 3d at 297.

Evidence of gross inadequacy of consideration has been considered by some Illinois courts as tantamount to fraud, whether actual or constructive. (See, *e.g., Smith v. Smith* (1930), 340 Ill. 34, 40; *In re Estate of Neprozatis* (1978), 62 Ill. App. 3d 563, 568-69.) Thus, where there is a substantial failure of consideration for a contract, particularly where the inadequacy is accompanied by other inequitable or unconscionable features, a court of equity may rescind or cancel the contract. (17 Am. Jur. 2d *Contracts* §502 at 978-79 (1964).) Alternatively, substantial nonperformance or breach of contract warrants rescission where the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it. (*Trapkus v. Edstrom's, Inc.* (1986), 140 Ill. App. 3d 720, 725.) A plaintiff desiring to rescind a contract must merely show the nonperformance or the inability to per-

form by defendant (*In re Estate of Morgan* (1981), 100 Ill. App. 3d 589, 592) and offer to return the value of the consideration received or otherwise return the other party to the status quo *ante* (*Hakala v. Illinois Dodge City Corp.* (1978), 64 Ill. App. 3d 114, 120).

■ A contract may be treated as unconscionable when it is improvident, oppressive, or totally one-sided. (*Streams Sports Club, Ltd. v. Richmond* (1983), 99 Ill. 2d 182, 191.) Even where there is no actual fraud, courts of equity will relieve against hard and unconscionable contracts which have been procured by taking advantage of the condition, circumstances or necessity of the other parties. (*Swiney v. Womack* (1931), 343 Ill. 278, 288.) Factors relevant to finding a contract unconscionable include gross disparity in the values exchanged or gross inequality in the bargaining positions of the parties together with terms unreasonably favorable to the stronger party. (See Restatement (Second) of Contracts §208, comments *c, d*, at 108-09 (1981); see also *American Buyers Club of Mt. Vernon, Inc. v. Grayling* (1977), 53 Ill. App. 3d 611, 616-17; Annot., 18 A.L.R.3d 1305, 1313-16 (1968); see generally J. Fort, *Understanding Unconscionability: Defining the Principle*, 9 Loy. U. Chi. L.J. 765 (1978).) Courts will also look to such factors as the age and education of the contracting parties, their commercial experience (*Neal v. Lacob* (1975), 31 Ill. App. 3d 137, 142), and whether the aggrieved party had a meaningful choice when faced with unreasonably unfavorable terms (*Ebersole v. Ebersole* (1988), 171 Ill. App. 3d 632, 635; *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.* (1980), 86 Ill. App. 3d 980, 989-90).

■ The circumstances existing when the contract was entered into in this case were such that the terms of the contract should be set aside as unconscionable. It is clear that the services rendered were of little or no value in contrast to the price paid to defendant. Gross excessiveness of price alone can make an agreement unconscionable. (J. Calamari & J. Perillo, Contracts §9—40, at 325 (2d ed. 1977).) Defendant performed services that had been performed a few weeks prior to June 23, including raising and levelling the condenser slab in less than 20 minutes with plaintiff's patio gravel for $210 and wet washing the condenser and coils for $138. Furthermore, he was to check, clean, and tighten the electrical connections for $69, fix the leak for $72, and add freon for another $119. In these last three tasks, defendant not only failed to perform substantially, but the unit was further disabled during defendant's service call whereas it had been mechanically operating prior to defendant's work on it. It is quite evident that the crux of the problem was a freon leak which was

easily corrected by yet another service company for only $72. In addition, defendant required the payment of $154 just to answer the service call and "diagnose" or, more properly, misdiagnose, the problem. We have no difficulty in concluding that there was a grossly disparate exchange of values here which may be due to defendant's incompetence or his sharp business practices.

The bargaining power of the parties was similarly disproportionate. Mrs. Ahern professed her ignorance of procedures for repairing an air conditioner, and she was obviously relying on defendant's purported expertise. The cooling failure occurred during a heat wave, and she was already liable for the $154 service call even before agreeing to the remaining repair charges. Mrs. Ahern testified that she felt intimidated by defendant. It is clear that defendant was in a superior bargaining position. Freedom to contract is enhanced by a requirement that both parties be aware of the burdens they are assuming; however, the notion of free will has little meaning as applied to one who is ignorant of the consequences of her acts. (*Frank's Maintenance & Engineering, Inc.*, 86 Ill. App. 3d at 990.) Courts must be realistic in examining the true nature of a consumer transaction such as this one where the complexity of the technology involved is such that it would be unconscionable to expect the ordinary consumer to have skill equal to that of the expert in dealing at arm's length. (See *Sutter v. St. Clair Motors, Inc.* (1963), 44 Ill. App. 2d 318, 323-24.) In view of the consumer's lack of experience in this type of transaction, the defendant's substantial charge for travel and diagnosis, his representations that the services were all necessary, and his insistence on immediate payment suggesting urgency, we conclude that this consumer had no meaningful choice and the agreement was not voluntarily and understandingly entered into.

Our review of the record persuades us that there was more than sufficient evidence for the trial court to set aside the unconscionable terms of the agreement and to allow defendant what it determined to be the actual value of his services. Any doubts have been resolved against appellant. The judgment of the trial court is not against the manifest weight of the evidence and will therefore be affirmed. Since there is a valid ground to affirm the trial court's decision, we need not further address defendant's arguments.

The judgment of the circuit court is affirmed.

Affirmed.

GEIGER and McLAREN, JJ., concur.