No. 2--06--0649          Filed:  9-24-07

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE UNITED CITY OF YORKVILLE and STANDARD BANK AND TRUST, as Trustee under a certain agreement dated 4/1/04 and known as Trust No. 18190, | ) ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiffs-Appellants, | ) ) ) | |
| v. | ) ) | No. 05--MR--447 |
| THE VILLAGE OF SUGAR GROVE, | ) ) ) | Honorable Michael J. Colwell, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE BYRNE delivered the opinion of the court:

Defendant, the Village of Sugar Grove (Sugar Grove), negotiated two independent jurisdictional boundary line agreements, one with plaintiff the United City of Yorkville (Yorkville) and one with the Village of Montgomery (Montgomery). Yorkville and Montgomery do not have a boundary line agreement, and Montgomery is not a party to this action. Sugar Grove, which is in Kane County, is north of Yorkville, which is in Kendall County. Montgomery, which is in Du Page County, is east of Sugar Grove and Yorkville.

In general, the agreements barred the respective parties from attempting to annex land beyond the boundary lines negotiated and set in the agreements. The two boundary lines partially overlap so that Yorkville and Montgomery are barred from attempting to annex the same area of land north of the Kane and Kendall county line. However, at one point, the boundary line set in the agreement

with Montgomery (Montgomery Agreement) turns north and then northeast, thereby permitting Montgomery to annex land that is off limits to Yorkville under its agreement (Yorkville Agreement). The parties discovered the difference in the agreements when plaintiff Standard Bank & Trust (Standard) and another property owner attempted to develop a parcel that straddles Yorkville and Montgomery.

Yorkville and Standard filed a four-count complaint against Sugar Grove for a declaratory judgment and for rescission or reformation of the Yorkville Agreement. Yorkville believes that it has at least an equal right to annex the land currently available to Montgomery. The complaint seeks (1) a declaratory judgment that the creation of the Montgomery Agreement invalidated the Yorkville Agreement, under section 11--12--9 of the Illinois Municipal Code (Municipal Code) (65 ILCS 5/11--12--9 (West 2006)); (2) a rescission of the Yorkville Agreement, for failure of consideration; (3) a rescission of the Yorkville Agreement, based on mutual and unilateral mistake; and (4) a reformation of the Yorkville Agreement, to allow each party to exercise jurisdiction over territory that was formerly under the jurisdiction of the other party.

Sugar Grove moved for dismissal of the complaint and for summary judgment under section 2--619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2--619.1 (West 2006)). Section 2--619.1 of the Code provides that motions prescribed by section 2--615, section 2--619, and section 2--1005 may be filed together as a single motion but that a combined motion shall be divided into parts that are limited to and specify the single section of the Code under which relief is sought. 735 ILCS 5/2--619.1 (West 2006). On February 24, 2006, the trial court granted Sugar Grove's motion to dismiss Standard as a party, under section 2--615. The court also granted Sugar Grove's motion to dismiss Yorkville's claims for rescission and reformation.

On June 1, 2006, the trial court addressed the parties' cross-motions for summary judgment on the enforceability of the Yorkville Agreement, under section 11--12--9 of the Municipal Code. The court granted Sugar Grove summary judgment on Yorkville's claim for a declaratory judgment. Yorkville and Standard filed a timely notice of appeal on June 29, 2006.

FACTS

Section 11--12--9 of the Municipal Code permits corporate authorities such as Sugar Grove, Yorkville, and Montgomery to enter into agreements to mark the boundaries of the jurisdiction of each of the corporate authorities. 65 ILCS 5/11--12--9 (West 2006). On April 27, 2000, Sugar Grove and Yorkville entered into the Yorkville Agreement. The parties agreed that the boundary line between the two municipalities would be the county line separating Kane County to the north and Kendall County to the south. Among other things, each party agreed not to annex territory or exercise similar jurisdictional acts in the other's jurisdiction. The relevant sections of the Yorkville Agreement provide as follows:

"1. That the VILLAGE OF SUGAR GROVE shall have jurisdiction north of a certain boundary line and the UNITED CITY OF YORKVILLE shall have jurisdiction south of a certain boundary line ***. The Boundary Line shall be the boundary between Kane and Kendall Counties.

2. The parties shall not attempt to exercise authority by annexing, zoning, or performing any other similar acts in territory lying within the jurisdiction of the other municipality.

***

4. All future annexation Ordinances adopted by the corporate authorities of both Cities shall be adopted in such form as to conform with the provisions of this Agreement. Each City hereby agrees that it shall not act to annex or exercise any zoning authority or subdivision control authority beyond the Jurisdictional Boundary Line established in this Agreement.

* * *

8. Nothing contained herein shall require either municipality to make improvements to Baseline Road[, which runs along the Boundary Line].

In the event that either municipality has an owner or developer along Baseline Road seeking Baseline Roadway improvements, said improvements shall be constructed by this owner or developer. A Recapture Ordinance for 50% of the cost of said roadway improvements with interest shall be enacted by the other municipality. If and when development occurs adjacent to the improved Baseline Road, then appropriate payment shall be made to the initial investor. ***

* * *

12. This Agreement shall be in full force and affect [sic] from and after its adoption and execution by the Village of Sugar Grove and by the United City of Yorkville and shall continue in full force and affect [sic] for a period of twenty (20) years. The term of this Agreement may be extended, renewed or revised at the end of the initial term or extended terms hereof by further agreement of the municipalities.

13. Major repairs or maintenance to Baseline Road to which both municipalities are contiguous at the time of repair shall be on a 50/50% cost sharing basis. Both municipalities

shall agree as to the nature and extent of the major repairs or maintenance. Additionally, local costs for signalizations on said roads shall be allocated based upon the number of intersection quadrants located in each municipality."

On March 26, 2001, Sugar Grove and Montgomery entered into the Montgomery Agreement. Sugar Grove and Montgomery established a boundary line that runs along the Kane and Kendall county line, Route 47, and Jericho Road. The relevant sections of the Montgomery Agreement provide as follows:

"1. That the boundary line between the two municipalities for the unincorporated area lying between them, for annexation and municipal government planning, subdivision control, official map, ordinances, and other municipal purposes shall be *** described as follows:

Beginning at the intersection of the centerline of Prairie Street and the centerline of the Commonwealth Edison Right-of-Way ***, thence southerly along the centerline of the said right-of-way to the centerline of Jericho Road; thence westerly along the centerline of said Jericho Road to the centerline of Illinois Route 47 to the Kane and Kendall County line; thence westerly along the Kane and Kendall County line to the termination point at the centerline of Ashe Road ***.

2. Except as otherwise provided herein, Montgomery shall have jurisdiction with respect to property lying easterly and southerly of the above-described boundary line, and Sugar Grove shall have jurisdiction of the property lying westerly and northerly of the above-described boundary line. On or after the date of this Agreement, neither party shall annex territory which lies within the jurisdiction of the other municipality as established by such

boundary line, nor shall it exercise or attempt to exercise or enforce any zoning, subdivision control, official map, or other municipal authority or ordinance.

* * *

7. This Agreement is not one intended to benefit a third party, and no third party beneficiary shall be deemed created hereby. This Agreement is binding only upon Sugar Grove and Montgomery, and their respective successors and assigns. Nothing herein shall be construed as a limitation on the right of either party with respect to its boundaries with any other municipality or unit of local government.

* * *

11. This Agreement shall be in full force and effect for a period of fifteen (15) years from the date hereof and for such further and additional time as the parties hereto may hereafter agree by amendment to this Agreement."

The Montgomery and Yorkville Agreements established for a short distance a shared boundary line along the Kane and Kendall county line, but the line in the Montgomery Agreement turns north at Route 47 and then northeast at Jericho Road, thereby permitting Montgomery to attempt to annex property east and south of that boundary line. The area available to Montgomery under the Montgomery Agreement comprises land that Yorkville had been barred from annexing under the Yorkville Agreement. Sugar Grove characterizes this area as a "buffer zone between its boundary line with Yorkville and where it set its boundary line with Montgomery."

Plaintiffs allege that Standard owns 36 acres in unincorporated Kane County north of the Kane and Kendall county line, south of Jericho Road, and east of Route 47. According to the complaint, Standard's property exists simultaneously within Sugar Grove's jurisdiction under the

Yorkville Agreement and Montgomery's jurisdiction under the Montgomery Agreement. Believing that the boundary line agreements are unenforceable under section 11--12--9 of the Municipal Code, Standard and another property owner, who owns land south of and adjacent to Standard's parcel, filed a joint petition with Yorkville to annex and develop the properties as a single planned unit development in Yorkville. The Yorkville Plan Commission scheduled a public hearing on the petition for September and October 2005. Sugar Grove threatened to file suit to enjoin the hearing. Standard and the other property owner voluntarily abandoned their petition for annexation, and plaintiffs filed their complaint in circuit court on October 19, 2005.

Plaintiffs' complaint seeks (1) a declaratory judgment that the creation of the Montgomery Agreement invalidated the Yorkville Agreement, under section 11--12--9 of the Municipal Code (65 ILCS 5/11--12--9 (West 2006)); (2) a rescission of the Yorkville Agreement, for failure of consideration; (3) a rescission of the Yorkville Agreement, based on mutual and unilateral mistake; and (4) a reformation of the Yorkville Agreement, to allow each party to exercise jurisdiction over territory that was formerly under the jurisdiction of the other party.

On November 21, 2005, Sugar Grove moved to dismiss Standard as a party, under section 2--615 of the Code. Sugar Grove argued that "[i]f, as the Bank argues, the [Yorkville] Agreement is invalid, then the Bank cannot possibly have third-party beneficiary status and would not have standing in the present suit." Sugar Grove argued further that Standard lacks standing because the Yorkville Agreement does not mention Standard; nothing rebuts the presumption that the agreement was intended solely for the direct benefit of Sugar Grove and Yorkville; and Standard, as a property owner, has no claim of entitlement to annexation to a given municipality and could not rely on the

Yorkville Agreement. On February 24, 2006, the trial court granted Sugar Grove's motion and dismissed Standard from the action.

On November 22, 2005, Sugar Grove moved for dismissal of the complaint and for summary judgment against Yorkville. First, pursuant to section 2--1005 of the Code, Sugar Grove argued that it is entitled to summary judgment on Yorkville's claim for declaratory judgment, because section 11--12--9 of the Municipal Code does not operate retroactively to invalidate the Yorkville Agreement. Second, pursuant to section 2--619 of the Code, Sugar Grove sought dismissal of the claims for rescission, arguing that the corporate limits of Sugar Grove and Yorkville have changed substantially since the formation of the Yorkville Agreement and, because it is impossible to restore the parties to the status quo ante, rescission is inappropriate. Third, pursuant to section 2--615, Sugar Grove sought dismissal of the claim for reformation, arguing that Yorkville had failed to allege the existence of a prior agreement from which a variance in the written agreement could be created. Fourth, pursuant to section 2--615, Sugar Grove sought dismissal of the claim for rescission based on mutual and unilateral mistake, arguing that Yorkville failed to adequately allege an actual mistake of fact. Fifth, pursuant to section 2--1005, Sugar Grove argued that it is entitled to summary judgment on Yorkville's claim for rescission for failure of consideration, because the creation of the Montgomery Agreement does not negate the consideration for the Yorkville Agreement. Sixth, pursuant to section 2--1005, Sugar Grove argued that it is entitled to summary judgment on Yorkville's claim for reformation, because there is no prior agreement from which a variance in the written agreement could be created and because there is no mistake of fact.

Also on November 22, 2005, Yorkville filed an opposing motion for summary judgment on its claim for a declaration of its rights under section 11--12--9 of the Municipal Code. Primarily,

Yorkville relied upon the current version of section 11--12--9, which provides in relevant part as follows:

"An agreement that addresses jurisdictional boundary lines shall be entirely unenforceable for any party thereto that subsequently enters into another agreement that addresses jurisdictional boundary lines that is in conflict with any of the terms of the first agreement without the consent of all parties to the first agreement." 65 ILCS 5/11--12--9 (West 2006).

However, the amendment that added the relied-upon provision was not enacted until July 29, 2005, which was five years after the Yorkville and Montgomery Agreements were executed. The trial court concluded that the amendment did not apply retroactively, and the court granted summary judgment for Sugar Grove on Yorkville's claim for a declaratory judgment of rights under section 11--12--9. The court further granted Sugar Grove a dismissal of the remaining counts. This timely appeal followed.

ANALYSIS

Plaintiffs appeal from the trial court's orders granting Sugar Grove summary judgment on Yorkville's claim under section 11--12--9, dismissing Standard from the action, and dismissing the remainder of the complaint. On appeal, the parties renew the arguments they presented in the trial court.

A. Section 11--12--9 of the Municipal Code

First, Yorkville asserts that section 11--12--9 of the Municipal Code applies retroactively to render the Yorkville Agreement unenforceable, and therefore, the trial court erred in granting Sugar Grove summary judgment on the issue. Summary judgment is proper if, when viewed in the light

most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2--1005(c) (West 2006). "The interpretation and applica[tion] of legislation present questions of law resolvable through summary judgment." Allegis Realty Investors v. Novak, 223 Ill. 2d 318, 330 (2006). A circuit court's grant of summary judgment is subject to de novo review, which likewise guides our consideration of the meaning and effect of a statutory provision. Allegis, 223 Ill. 2d at 330.

In interpreting a statute, this court's primary objective is to determine and give effect to the intent of the legislature, the best indicator of which is the language of the statute. In re Marriage of Golden, 358 Ill. App. 3d 464, 472 (2005). When the statutory language is clear and unambiguous, it ordinarily must be given effect as written. Golden, 358 Ill. App. 3d at 472. Our supreme court has recently restated the rule that "[i]t is never proper for a court to depart from plain language by reading into the statute exceptions, limitations, or conditions which conflict with the clearly expressed legislative intent." People v. Hari, 218 Ill. 2d 275, 292 (2006). "Statutes should be construed, if possible, so that no term is rendered superfluous or meaningless." Bonaguro v. County Officers Electoral Board, 158 Ill. 2d 391, 397 (1994).

At the time the agreements were executed, section 11--12--9 provided in relevant part as follows:

"If unincorporated territory is within one and one-half miles of the boundaries of two or more corporate authorities that have adopted official plans, the corporate authorities involved may agree upon a line which shall mark the boundaries of the jurisdiction of each of the corporate authorities who have adopted such agreement. On and after September 24,

1987, such agreement may provide that one or more of the municipalities shall not annex territory which lies within the jurisdiction of any other municipality, as established by such line. In the absence of such a boundary line agreement, nothing in this paragraph shall be construed as a limitation on the power of any municipality to annex territory. In arriving at an agreement for a jurisdictional boundary line, the corporate authorities concerned shall give consideration to the natural flow of storm water drainage, and, when practical, shall include all of any single tract having common ownership within the jurisdiction of one corporate authority. ***

Any agreement for a jurisdictional boundary line shall be valid for such term of years as may be stated therein, but not to exceed 20 years, and if no term is stated, shall be valid for a term of 20 years. The term of such agreement may be extended, renewed or revised at the end of the initial or extended term thereof by further agreement of the municipalities.

In the absence of such agreement, the jurisdiction of any one of the corporate authorities shall extend to a median line equidistant from its boundary and the boundary of the other corporate authority nearest to the boundary of the first corporate authority at any given point on the line.

This amendatory Act of 1990 is declarative of the existing law and shall not be construed to modify or amend existing boundary line agreements, nor shall it be construed to create powers of a municipality not already in existence." 65 ILCS 5/11--12--9 (West 2000). On July 29, 2005, the legislature enacted Public Act 94--374 (Pub. Act 94--374, §5, eff. July 29, 2005), which added the following relevant provisions to section 11--12--9:

"An agreement that addresses jurisdictional boundary lines shall be entirely unenforceable for any party thereto that subsequently enters into another agreement that addresses jurisdictional boundary lines that is in conflict with any of the terms of the first agreement without the consent of all parties to the first agreement.

\*\*\*

Except for those provisions to take effect prospectively, this amendatory Act of the 94th General Assembly is declarative of existing law and shall not be construed to modify or amend existing boundary line agreements entered into on or before the effective date of this amendatory Act, nor shall it be construed to create powers of a municipality not already in existence on the effective date of this amendatory Act." 65 ILCS 5/11--12--9 (West 2006).

Yorkville argues that section 11--12--9, as amended by Public Act 94--374, applies retroactively and that the Yorkville and Montgomery Agreements conflict, and therefore, the Yorkville Agreement is "entirely unenforceable." Sugar Grove responds that the second paragraph of the above-quoted portion of the new statute shows that the amendment to section 11--12--9 applies only prospectively and does not affect the Yorkville and Montgomery Agreements, which were executed before the amendment. For the following reasons, we conclude that the new version of section 11--12--9 applies only prospectively, and therefore, the trial court correctly ruled against Yorkville on its statutory claim.

In determining whether a statute applies retroactively, our supreme court has adopted the approach set forth by the United States Supreme Court in Landgraf v. USI Film Products, 511 U.S. 244, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994). Allegis, 223 Ill. 2d at 330. The Landgraf analysis consists of two steps. "First, if the legislature has expressly prescribed the statute's temporal reach,

the expression of legislative intent must be given effect absent a constitutional prohibition." Allegis, 223 Ill. 2d at 330. "Second, if the statute contains no express provision regarding its temporal reach, the court must determine whether the new statute would have retroactive effect, keeping in mind the general principle that prospectivity is the appropriate default rule." Allegis, 223 Ill. 2d at 330-31. In answering these questions, a court should consider "whether retroactive application of the new statute will impair rights that a party possessed when acting, increase a party's liability for past conduct, or impose new duties for transactions already completed. If retrospective application of the new law has inequitable consequences, a court will presume that the statute does not govern absent clear legislative intent favoring such a result." Allegis, 223 Ill. 2d at 331, citing Landgraf, 511 U.S. at 280, 128 L. Ed. 2d at 262, 114 S. Ct. at 1505.

Upon adopting the Landgraf framework, our supreme court considered the effect of section 4 of the Statute on Statutes (5 ILCS 70/4 (West 2006)) on the retroactivity analysis. Allegis, 223 Ill. 2d at 331. Section 4, invoked by Sugar Grove here and often referred to as the "general saving clause of Illinois," provides as follows:

> "No new law shall be construed to repeal a former law, whether such former law is expressly repealed or not, as to any offense committed against the former law, or as to any act done, any penalty, forfeiture or punishment incurred, or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offense or act so committed or done, or any penalty, forfeiture or punishment so incurred, or any right accrued, or claim arising before the new law takes effect, save only that the proceedings thereafter shall conform, so far as practicable, to the laws in force at the time of such proceeding." 5 ILCS 70/4 (West 2006).

Our supreme court has viewed section 4 as a "clear legislative directive as to the temporal reach of statutory amendments and repeals when none is otherwise specified: those that are procedural may be applied retroactively, while those that are substantive may not." Allegis, 223 Ill. 2d at 331. "This principle applies to both civil and criminal enactments." Allegis, 223 Ill. 2d at 331. In light of section 4, the supreme court has held that an Illinois court need not proceed beyond the first step of the Landgraf test, because the legislature will always have clearly indicated the temporal reach of an amended statute, either expressly in the new legislative enactment or by default in section 4 of the Statute on Statutes. Allegis, 223 Ill. 2d at 331-32; Caveney v. Bower, 207 Ill. 2d 82, 95 (2003).

Because it is a default standard, section 4 of the Statute on Statutes is inapplicable where the legislature has clearly indicated the temporal reach of a statutory amendment. "Whenever a court is called upon to assess the applicability of a statutory change, the court must therefore still make an initial determination as to whether the legislature has clearly indicated the amended statute's temporal reach. If it has, there is no need to invoke section 4 of the Statute on Statutes. Rather, in accordance with Landgraf, the expression of legislative intent must be given effect absent constitutional prohibition." Allegis, 223 Ill. 2d at 332.

The approach set forth in Landgraf and adopted by our supreme court is "time-neutral," which means that its applicability is not affected by whether the expression of legislative intent calls for prospective or retroactive application. "If the General Assembly has clearly expressed an intention that a statute be given retroactive effect, we must honor that intention unless the constitution prohibits us from doing so." Allegis, 223 Ill. 2d at 332.

With these principles in mind, we now consider Public Act 94--374, which amended section 11--12--9 by adding the unenforceability provision regarding conflicting boundary line agreements. Our analysis begins and ends with the initial inquiry of whether the General Assembly expressly indicated the temporal reach of the statute. The clear, unambiguous language indicates that the General Assembly intended the amendment to operate prospectively.

The new section 11--12--9 provides that "[e]xcept for those provisions to take effect prospectively, this amendatory Act of the 94th General Assembly is declarative of existing law and shall not be construed to modify or amend existing boundary line agreements entered into on or before the effective date of this amendatory Act, nor shall it be construed to create powers of a municipality not already in existence on the effective date of this amendatory Act." (Emphasis added.) 65 ILCS 5/11--12--9 (West 2006). Thus, the new section 11--12--9 is specifically directed to boundary line agreements executed after the enactment of Public Act 94--374. See 65 ILCS 5/11--12--9 (West 2006). Because the General Assembly directed the changes in the law to events that occur after Public Act 94--374 took effect, the changes are intrinsically prospective. Yorkville's position that the General Assembly intended a retroactive application cannot be squared with the statute's clear and unambiguous terms. Furthermore, Yorkville does not contend that those terms are unconstitutional.

In any event, even if the language of the statute were unclear as to its retroactive or prospective application, we would conclude that it should not apply retroactively because the changes are substantive rather than procedural. While the distinction between "procedure" and "substance" is not always clear, "procedure" generally prescribes the means for enforcing rights or receiving remedies through a lawsuit. People v. Atkins, 217 Ill. 2d 66, 71-72 (2005), quoting Rivard v.

Chicago Fire Fighters Union, Local No. 2, 122 Ill. 2d 303, 310-11 (1988). Procedure encompasses " ' "pleading, evidence and practice. Practice means those legal rules which direct the course of proceedings to bring parties into court and the course of the court after they are brought in." [Citation.]' " Atkins, 217 Ill. 2d at 72, quoting Rivard, 122 Ill. 2d at 310-11. In contrast, "substantive law" involves the rights underlying the lawsuit. Atkins, 217 Ill. 2d at 72, quoting Rivard, 122 Ill. 2d at 310.

Yorkville takes the position that the amendment to section 11--12--9 is procedural because "[i]t directly relates to a method of enforcing boundary line agreements authorized under section 11--12--9 and prescribes a method of enforcing rights and obtaining redress when two boundary line agreements conflict." (Emphasis added.) We reject that position. In fact, the statute is silent as to the pleading, evidence, and practice for establishing the unenforceability of allegedly conflicting agreements. The amendment is better characterized as creating a substantive right for a corporate authority to invalidate a prior boundary line agreement that conflicts with a more recent boundary line agreement to which the complaining authority is a party.

Because we conclude that the new version of section 11--12--9 does not apply retroactively, we need not consider whether the Yorkville and Montgomery Agreements "conflict" under the statute.

### B. Rescission

Second, Yorkville argues that its agreement with Sugar Grove must be rescinded for lack of consideration or for a mutual or unilateral mistake. Sugar Grove prevailed on this issue below in the context of a hybrid motion to dismiss under sections 2--615 and 2--619 of the Code. A motion to dismiss pursuant to section 2--615 of the Code (735 ILCS 5/2--615 (West 2006)) attacks the legal

sufficiency of a complaint and raises the question of whether the complaint states a claim upon which relief may be granted. Beahringer v. Page, 204 Ill. 2d 363, 369 (2003). A motion to dismiss pursuant to section 2--619 of the Code (735 ILCS 5/2--619 (West 2006)) admits the legal sufficiency of a complaint but raises defects, defenses, or other affirmative matters that appear on the complaint's face or that are established by external submissions acting to defeat the complaint's allegations. Kedzie & 103rd Currency Exchange, Inc. v. Hodge, 156 Ill. 2d 112, 115 (1993). Mindful of the procedural context, we review the issue de novo.

" '[R]escission' is the cancelling of a contract so as to restore the parties to their initial status." Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co., 355 Ill. App. 3d 156, 165 (2004), quoting Horan v. Blowitz, 13 Ill. 2d 126, 132 (1958). "Where a contract is rescinded, the rights of the parties under that contract are vitiated or invalidated." Coregis, 355 Ill. App. 3d at 165. It is " ' "an equitable doctrine, and a party seeking rescission must restore the other party to the status quo existing at the time the contract was made." ' " Coregis, 355 Ill. App. 3d at 165, quoting International Insurance Co. v. Sargent & Lundy, 242 Ill. App. 3d 614, 628 (1993), quoting Puskar v. Hughes, 179 Ill. App. 3d 522, 528 (1989).

Yorkville claims that rescission of the Yorkville Agreement is necessary because Sugar Grove's execution of the Montgomery Agreement constituted a substantial breach of its obligations under the Yorkville Agreement. "Consideration is any act or promise which is of benefit to one party or disadvantageous to the other." Ahern v. Knecht, 202 Ill. App. 3d 709, 715 (1990). "Generally, courts will not inquire into the sufficiency of the consideration to support a contract. [Citation.] However, where the amount of consideration is so grossly inadequate as to shock the conscience of the court, the contract will fail." Ahern, 202 Ill. App. 3d at 715. "[S]ubstantial nonperformance or

breach of contract warrants rescission where the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it." Ahern, 202 Ill. App. 3d at 715. A plaintiff desiring to rescind a contract must merely show the defendant's nonperformance or inability to perform and offer to return the value of the consideration received or otherwise return the defendant to the status quo ante. Ahern, 202 Ill. App. 3d at 715-16.

Yorkville asserts that it and Sugar Grove can be restored to the status quo ante if the Yorkville Agreement is rescinded. We disagree. At the time the Yorkville Agreement was executed, neither Yorkville nor Sugar Grove was contiguous with the subject property, and the corporate limits of the municipalities were not in the immediate area. The boundary line in the Yorkville Agreement was established in light of their then-existing corporate limits. Since the execution of the agreement, however, Yorkville's corporate limits moved north toward the county line while Sugar Grove's limits did not move nearly as far south. To restore Sugar Grove to the status quo ante, Yorkville would need to disconnect the property it annexed since the execution of the agreement, but Yorkville has not offered to do so and nothing suggests that it could.

Yorkville contends that the status quo ante can be restored because the Yorkville Agreement is set to expire after a 20-year term. The Yorkville Agreement established a jurisdictional boundary line and granted each party the right to exclude the other from annexing property on its side of the line. When the agreement expires, Yorkville and Sugar Grove will be free to annex adjacent property that no municipality has annexed. Thus far, Sugar Grove has chosen to forgo rapid annexation in favor of transferring part of its annexation rights to Montgomery. However, Yorkville has already

-18-

annexed much of the property to which it is entitled under the agreement, such that little will be left for Sugar Grove to annex when the agreement expires.

If we were to allow rescission of the Yorkville Agreement, we would effectively reset the jurisdictional boundary line to a point equidistant from the corporate limits of Yorkville and Sugar Grove as they exist today, not as they existed when the agreement was executed. See 65 ILCS 5/11--12--9 (West 2000) ("In the absence of such [a boundary line] agreement, the jurisdiction of any one of the corporate authorities shall extend to a median line equidistant from its boundary and the boundary of the other corporate authority nearest to the boundary of the first corporate authority at any given point on the line"). The line equidistant from the corporate limits of Yorkville and Sugar Grove is farther north today than when the Yorkville Agreement was executed, because Yorkville has annexed more property during that time than has Sugar Grove. Rescinding the Yorkville Agreement, thereby moving the boundary line north, would divest Sugar Grove of its contractual right to annex certain unincorporated property south of that line. We conclude that the trial court correctly ruled that rescission of the Yorkville Agreement is not a proper remedy because the parties cannot be restored to the status quo ante.

Yorkville further argues that "[i]f this court finds that the language of the Yorkville Agreement does not prohibit Sugar Grove from entering into a subsequent agreement with Montgomery over the same boundary line and unincorporated territory, then, based upon the language of the agreement, this obviously was not the true intent of the parties or, alternatively, was not Yorkville's intent." Yorkville argues that rescission is necessary based on a mutual mistake by Yorkville and Sugar Grove or a unilateral mistake by Yorkville as to the true nature of the agreement.

"To invalidate an agreement, a mistake must relate to a past or present fact material to the contract." Corcoran v. Northeast Illinois Regional Commuter R.R. Corp., 345 Ill. App. 3d 449, 454 (2003). "Predictions usually do not qualify as such present facts [citation], and mistaken predictions will not invalidate a contract." Corcoran, 345 Ill. App. 3d at 454. Since parties generally enter into contracts expecting to benefit, the adoption of Yorkville's position would invalidate a contract in which either party fails to reap the expected benefits. Rescinding the Yorkville Agreement in this case would leave parties to a contract uncertain as to whether they have a valid contract throughout the period of performance, as events might make the contract disadvantageous for one party who expected a benefit. Public policy demands greater certainty concerning contracts, and the mistaken prediction here provides no grounds for rescinding the Yorkville Agreement. See Corcoran, 345 Ill. App. 3d at 454.

Yorkville apparently was mistaken as to the actions Sugar Grove would take in exercising its rights under the Yorkville Agreement. Nothing in the Yorkville Agreement barred Sugar Grove from granting an adjacent municipality the right to exercise jurisdiction over the property north of the Kane and Kendall county line. Yorkville was mistaken only to the extent that it misinterpreted the legal effect of the contract and miscalculated Sugar Grove's intent to exercise its rights under the Municipal Code.

Yorkville cites Harbaugh v. Hausman, 210 Ill. App. 3d 715 (1991), for the proposition that rescission of the Yorkville Agreement is appropriate even if its mistake was one of law rather than fact. We disagree. Harbaugh restated the well-settled principle denying equitable relief from an instrument entered into with a mistake as to the legal significance of that instrument. Harbaugh, 210 Ill. App. 3d at 720. Harbaugh then adopted an exception to the general rule, holding that rescission

was appropriate in that case because the mistake concerned the party's own legal rights antecedent to the agreement. Harbaugh, 210 Ill. App. 3d at 722. Harbaugh is factually distinguishable from this case. In Harbaugh, the mistake concerned the legal ramifications of a prior transaction on a subsequent transaction. Here, neither Yorkville nor Sugar Grove was mistaken as to its rights before entering into the Yorkville Agreement. Yorkville was mistaken only as to the effect of future agreements, such as the Montgomery Agreement.

### C. Reformation

Third, Yorkville argues that it is entitled to a reformation of its agreement with Sugar Grove, to represent the "true intentions" of the parties. Yorkville contends that "the language of the Yorkville Agreement itself demonstrates that it was the intention of the parties that each municipality would retain exclusive jurisdiction over their respective territory." Yorkville argues that, if we reject its claim for rescission, we should reform the agreement to allow each party to exercise jurisdiction over territory that was formerly under the jurisdiction of the other party.

"A written contract may be reformed to reflect the intention of the parties and the agreement between them." Schivarelli v. Chicago Transit Authority, 355 Ill. App. 3d 93, 99 (2005). " ' "An action to reform a written agreement rests upon a theory that the parties came to an understanding, but in reducing it to writing, through mutual mistake, or through mistake of one side and fraud on the other, some provision agreed upon was omitted, and the action is to so change the instrument as written as to conform it to the contract agreed upon, by inserting the provisions omitted or striking out the one inserted by mutual mistake." ' " Schivarelli, 355 Ill. App. 3d at 100, quoting Suburban Bank of Hoffman-Schaumburg v. Bousis, 144 Ill. 2d 51, 58-59 (1991), quoting Harley v. Magnolia Petroleum Co., 378 Ill. 19, 28 (1941).

To state a cause of action for reformation of a contract, the plaintiff must assert: (1) the existence and substance of an agreement between the parties and the identity of the parties to the agreement; (2) the parties' agreement to reduce their agreement to writing; (3) the substance of the written agreement; (4) that a variance exists between the parties' original agreement and the writing; and (5) mutual mistake or some other basis for reformation. Schivarelli, 355 Ill. App. 3d at 100. "A 'mutual mistake of fact' exists for purposes of the reformation of a written instrument, when the contract has been written in terms which violate the understanding of both parties." In re Marriage of Miller, 363 Ill. App. 3d 906, 913 (2006), quoting In re Marriage of Johnson, 237 Ill. App. 3d 381, 394 (1992).

In dismissing the reformation claim, the trial court stated, "there is no evidence [that] may be presented to this Court to demonstrate the existence of a mistake in this municipal contract." We agree with the trial court. Yorkville's claim for reformation asks to place the parties in the status quo ante, and therefore, it appears to be little more than a thinly veiled claim for rescission, which we have already determined is inappropriate. Yorkville's claim for reformation of the Yorkville Agreement fails for the same reason as its claim for rescission: no mutual mistake of fact exists.

### D. Standard as Third-Party Beneficiary

Finally, plaintiffs argue that, assuming that additional proceedings in the circuit court are required, we should find that Standard is an intended third-party beneficiary of the Yorkville Agreement and, therefore, the trial court erred in dismissing Standard from the proceedings. Because we conclude that the trial court ruled correctly on the motions to dismiss and for summary judgment, we need not decide the issue.

### CONCLUSION

We affirm the trial court's orders (1) granting Sugar Grove summary judgment on Yorkville's claim for a declaratory judgment under section 11--12--9 of the Municipal Code; (2) dismissing Yorkville's claims for rescission and reformation of the Yorkville Agreement; and (3) dismissing Standard from the action.

Affirmed.

GILLERAN JOHNSON and ZENOFF, JJ., concur.