# Illinois Official Reports

## Appellate Court

*Dohrmann v. Swaney*, 2014 IL App (1st) 131524

| | |
|---|---|
| Appellate Court Caption | GEORGE J. DOHRMANN III, Plaintiff-Appellant, v. THOMAS E. SWANEY, Independent Executor of the Estate of Virginia H. Rogers, Deceased, Defendant-Appellee. |
| District & No. | First District, Fourth Division<br>Docket No. 1-13-1524 |
| Filed<br>Rehearing denied | June 26, 2014<br>July 24, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action seeking the enforcement of an agreement plaintiff made with an elderly widow who had a cooperative apartment in a building where plaintiff also owned an apartment, the trial court properly entered summary judgment for the widow's estate based on the finding that the agreement was unenforceable, since the agreement provided that the widow would convey to plaintiff upon her death her apartment, its contents and $4 million in consideration of his past and future services, and helping continue the widow's name by incorporating her last name in the names of his children, since the consideration was grossly inadequate and it was unfair in view of the extremely disproportionate bargaining power of the parties. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-L-1602; the Hon. Mary L. Mikva, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Harrison & Held LLP, of Chicago (Henry N. Novoselsky, of counsel), for appellant.

James W. Hitzeman, Patricia M. Petrowski, and Kathleen L. Carlson, all of Sidley Austin LLP, of Chicago, for appellee.

Panel

JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Lavin concurred in the judgment and opinion.

**OPINION**

¶ 1    Appellant George J. Dohrmann III appeals from the circuit court's grant of summary judgment to appellee Thomas E. Swaney, independent executor of the estate of Virginia H. Rogers, deceased (the Estate), as to the two remaining counts of his complaint. These counts relate to an alleged agreement made between Dorhmann and Mrs. Rogers prior to Mrs. Rogers' death in which Mrs. Rogers signed a document (the contract) agreeing to give Dohrmann, in part, her apartment and all of the items contained therein, as well as the sum of $4 million. Dohrmann contends on appeal that the trial court erred in granting summary judgment. For the following reasons, we affirm.

¶ 2                                      I. BACKGROUND

¶ 3    Dohrmann, who was Mrs. Rogers' neighbor, filed a five-count fourth amended complaint against Thomas E. Swaney, as guardian of the estate of Virginia Rogers, a disabled person, and as successor trustee of the Virginia H. Rogers Trust (Trust),[1] based on a contract dated April 1, 2000. Under the purported contract, in exchange for Dohrmann's "past and future services," including helping to continue the Rogers name by incorporating it into his children's names, Mrs. Rogers agreed to convey to Dohrmann upon her death her apartment and everything within it, as well as the sum of $4 million. The contract states that Mrs. Rogers will carry out this promise through her "Will and Testament or other testamentary substitute." Dohrmann alleged that he legally changed the names of his minor children to add the Rogers name and that he believed he had performed all his duties under the contract. Mrs. Rogers filed a counterclaim alleging that the contract was the product of fraud in the execution.

¶ 4    At the time of the summary judgment disputed herein, only counts I and II remained. By count I, Dohrmann requested a declaratory judgment settling the rights of the parties under the contract and imposing a constructive trust on Mrs. Rogers' apartment and $4 million worth of

_____

[1]Mrs. Rogers has since died, and the cause is now captioned "GEORGE J. DOHRMANN III v. THOMAS E. SWANEY, as Independent Executor of the Estate of Virginia H. Rogers, Deceased."

- 2 -

assets for the benefit of Dohrmann. By count II, Dohrmann requested a declaration that the transfer of Mrs. Rogers' apartment to the Trust is void, the creation of a constructive trust on the apartment for the benefit of Dohrmann, or, in the alternative, a money judgment in the amount equal to the present value of Mrs. Rogers' apartment. Mrs. Rogers' estate then filed a one-count counterclaim, alleging that the contract was a product of fraud in the execution and asking the court to declare the contract invalid and unenforceable and to require Dohrmann to pay compensatory and punitive damages.

¶ 5    Most of the background facts are not in dispute, although the parties to disagree whether certain information is properly before the court under the Dead-Man's Act (735 ILCS 5/8-201 (West 2012)). In this Background section, we consider only the facts properly before this court, and address the Dead-Man's Act argument in the Analysis section.

¶ 6    Dohrmann first met Mrs. Rogers in 1984. They lived in the same building, the Drake Tower, a cooperative apartment building, at 179 E. Lake Shore Drive. Mrs. Rogers' apartment was substantially larger than Dohrmann's apartment. The apartment was Mrs. Rogers' primary residence, while Dohrmann's apartment was not his primary residence.

¶ 7    At the time they met, Mrs. Rogers was a 73-year-old widow. She had never had nor adopted any children. Dohrmann was a 40-year-old neurosurgeon, married to Dr. Helen Dohrmann. Eventually, they had two children, George IV and Geoffrey. Dohrmann and his wife are still married.

¶ 8    Dohrmann and Mrs. Rogers began to socialize together more frequently in the early 1990s and served together on the board of the Drake Tower apartments. Mrs. Rogers got to know Dohrmann's wife and children during this time. From the record, it appears Mrs. Rogers initially enjoyed Dohrmann's attention, but then became concerned that he was befriending her in order to get her property upon her death.

¶ 9    In 1997 or 1998, Dohrmann approached Mrs. Rogers about adult adoption, suggesting that one of them adopt the other. Dohrmann testified in deposition that Mrs. Rogers often said she regretted not having any children, and Dohrmann wanted to give her the family she never had. To that end, Dohrmann consulted with an attorney, who advised him that adult adoptions could be done in Arkansas and referred him to an Arkansas attorney. In March 1998, Dohrmann traveled to Little Rock, Arkansas, and met with an attorney who specialized in adoption law. Upon learning that residency is a prerequisite for adult adoption in Arkansas, Dohrmann entered into a written lease for an apartment in North Conway, Arkansas. The adoption attorney advised Dohrmann that he needed a signed letter of engagement from Mrs. Rogers in order to proceed. However, Mrs. Rogers never submitted a signed letter of engagement to the attorney and Dohrmann never adopted Mrs. Rogers, nor was he ever adopted by Mrs. Rogers.

¶ 10   In February 2000, Dohrmann met with an estate planning attorney in Chicago, inquiring what one would do if he wished to receive something in exchange for something after a person died. The attorney drafted a skeleton agreement and subsequently discussed the agreement with Dohrmann. The attorney did not, however, participate in the preparation or execution of the contract in question here.

¶ 11   On April 1, 2000, Dohrmann and Mrs. Rogers, who was 89 years old at the time, signed the contract. There were no witnesses present at the signing. Mrs. Rogers did not communicate with her long-time lawyer and advisor, Mr. Swaney, regarding the contract. Mr. Swaney did not, in fact, learn of the contract until just prior to the initiation of the instant lawsuit. The contract in its entirety reads:

"Agreement

Dear George:

In exchange for your past and future services and other good and valuable consideration (including helping the Rogers name to continue after my death by incorporating it into your children's names), I (Virginia H. Rogers) agree to give you (George J. Dohrmann III) upon my death 1) my apartment in the Drake Tower (shares of 11-East, Drake Tower Apartments, Inc. in Chicago) and all furniture, furnishings, personal effects and other property contained within it and the elevator vestibule at the time of my death 2) the sum of four million dollars ($4,000,000.00), and so will provide in my Last Will and Testament or other testamentary substitute that may take effect upon my death (my 'testamentary documents'). If my testamentary documents fail to provide you with the above, you or your estate, shall have a valid claim against my estate for such amount.

It is my request that you pay my friend and lawyer, Thomas E. Swaney, the sum of one hundred thousand dollars ($100,000.000) as a surprise gift from me.

This agreement may not be amended, modified or canceled except by written agreement signed by you and me. This agreement sets forth our entire agreement and understanding with respect to the matters covered hereby and supersedes all of our prior agreements or understandings with respect to the subject matter hereof. This agreement shall be governed by and construed in accordance with the laws of the State of Illinois applicable to contracts to be performed entirely within such State (determined without regard to choice of law provisions thereof).

If the above correctly sets forth your understanding of our agreement, please indicate your acceptance by signing this agreement in the space provided below.

Understood, accepted and agreed on April 1, 2000:

s/ George J. Dohrmann III

Signed on April 1, 2000:

s/ Virginia H. Rogers"

¶ 12    An appraiser estimated that the value of Mrs. Rogers' apartment as of April 1, 2000, was approximately $1,438,000. Another appraiser estimated that the value of the "furniture, furnishings, personal effects and other property contained within it and the elevator vestibule" as of April 1, 2000, was approximately $100,045.

¶ 13    Two months later, on June 22, 2000, Dohrmann's two sons' names were legally changed to include "Rogers" as one of their middle names. Their names are now George John Rogers Dohrmann IV, and Geoffrey Edward David Rogers Dohrmann. At that time, George IV was 13 years old and Geoffrey was 7 years old. In practice, the boys (now young men) use the Rogers name inconsistently. George IV used it on his high school diploma and college applications, but, according to George IV's deposition testimony, he did not use it on his driver's license, his student ID card, his checking account, his credit card, his high school papers, his high school exams, or his Facebook page. Geoffrey testified that he did not have a driver's license or state identification card, but that he used the Rogers name "whenever [he] writes down [his] full name when necessary." He testified that he used the Rogers name on his high school applications, his student ID card, and his ATM card. He did not use it on his Facebook page, but did use his two other middle names.

¶ 14    On April 1, 2000, the date the contract was executed, Mrs. Rogers' estate plan consisted of her will and the Trust. Neither included at that time or any other time a provision for the benefit of Dohrmann or for any member of his family. Rather, her estate plan consisted of bequests to various friends and distant relatives aggregating several million dollars, with the remainder of the estate distributable to seven Chicago-based charities and Mrs. Rogers' alma mater.

¶ 15    In November 2004, Mrs. Rogers transferred legal ownership of her apartment to the Trust, where it remains as an asset. In March 2008, an order was entered in probate court designating Mrs. Rogers a disabled person based on her suffering from moderate dementia and probable Alzheimer's disease. She was adjudicated to be without capacity to manage her estate or financial affairs. Mr. Swaney was appointed as the guardian of her estate.

¶ 16    Dohrmann filed his original complaint in February 2007, of which only counts I and II remained at the time of summary judgment. The Estate filed its counterclaim as part of its answer. The parties then filed cross-motions for summary judgment as to the claims against them. In its motion for summary judgment, the Estate argued that the contract should be set aside as a matter of law because the consideration was so grossly inadequate as to shock the conscience; the undisputed facts demonstrate that this inadequate consideration was accompanied by circumstances of unfairness; and the contract is unconscionable.

¶ 17    In September 2011, the circuit court entered an order barring admission of Dohrmann's testimony and that of his wife regarding conversations with Mrs. Rogers and her participation in the preparation and execution of the contract, as well as the name change hearing.

¶ 18    In 2012, the circuit court, in a memorandum order, found that the contract was not enforceable, granted the Estate's motion for summary judgment on counts I and II, and denied Dohrmann's motion for summary judgment on the Estate's counterclaim. Dohrmann appeals the grant of summary judgment against him on counts I and II.

¶ 19                                                    II. ANALYSIS

¶ 20    On appeal, Dohrmann contends the trial court erred in granting summary judgment. He argues that summary judgment was improper because: (1) the value of Dohrmann's performance, that is, his sons' name changes, is a disputed issue of fact; (2) Mrs. Rogers' motive for entering into the contract is a disputed issue of fact; (3) the existence of "circumstances of unfairness" in the making of the contract is a disputed issue of fact; and (4) the testimony of Rogers' friends that Rogers believed Dohrmann was trying to get her apartment and her estate was inadmissible hearsay and should not have been considered by the court. For the following reasons, we affirm.

¶ 21    Summary judgment is proper when the pleadings, affidavits, depositions and admissions of record, construed strictly against the moving party, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2010). In ruling on a motion for summary judgment, the circuit court is to determine whether a genuine issue of material fact exists, not try a question of fact. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). A party opposing a motion for summary judgment "must present a factual bias which would arguably entitle him to a judgment." *Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority*, 172 Ill. 2d 243, 256 (1996). When determining whether a genuine issue of material fact exists, the pleadings are to be liberally construed in favor of the nonmoving party. *Williams*, 228 Ill. 2d at 417. "Summary judgment is to be encouraged in the interest of prompt disposition of lawsuits, but as a drastic measure it

should be allowed only when a moving party's right to it is clear and free from doubt." *Pyne v. Witmer*, 129 Ill. 2d 351, 358 (1989).

¶ 22    The primary objective in contract construction is to give effect to the intent of the parties. If the contract is clear and unambiguous, the court must determine the parties' intent solely from the ordinary and natural meaning of the language of the contract. *Omnitrus Merging Corp. v. Illinois Tool Works, Inc.*, 256 Ill. App. 3d 31, 34 (1993).

¶ 23    The basic requirements of a contract are an offer, acceptance, and consideration. *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 151 (2006). The determination of whether consideration is sufficient to support a contract is a question of law for the court to decide. Valuable consideration for a contract consists of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other. *F.H. Prince & Co. v. Towers Financial Corp.*, 275 Ill. App. 3d 792, 798 (1995); *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 330 (1977) (any act or promise that benefits one party or disadvantages the other is sufficient consideration to support the formation of a contract). Whether a contract contains consideration is a question of law, which we review *de novo*. *In re Marriage of Tabassum*, 377 Ill. App. 3d 761, 770 (2007). "[W]here the amount of consideration is so grossly inadequate as to shock the conscience of the court, the contract will fail." *Ahern v. Knecht*, 202 Ill. App. 3d 709, 715 (1990). This court has considered the issue of gross inadequacy of consideration:

> "Evidence of gross inadequacy of consideration has been considered by some Illinois courts as tantamount to fraud, whether actual or constructive. [Citations.] Thus, where there is a substantial failure of consideration for a contract, particularly where the inadequacy is accompanied by other inequitable or unconscionable features, a court of equity may rescind or cancel the contract. ***
>
> A contract may be treated as unconscionable when it is improvident, oppressive, or totally one-sided. [Citation.] Even where there is no actual fraud, courts of equity will relieve against hard and unconscionable contracts which have been procured by taking advantage of the condition, circumstances or necessity of the other parties. [Citation.] Factors relevant to finding a contract unconscionable include gross disparity in the values exchanged or gross inequality in the bargaining positions of the parties together with terms unreasonably favorable to the stronger party. [Citations.] Courts will also look to such factors as the age and education of the contracting parties, their commercial experience [citation], and whether the aggrieved party had a meaningful choice when faced with unreasonably unfavorable terms [citations]." *Ahern*, 202 Ill. App. 3d at 715-16.

Moreover, "[w]here the amount of the consideration which passed is not only so grossly inadequate as to shock the conscience of the court, but also accompanied by circumstances of unfairness, the court is in a position to set aside the transaction. [Citations.] Where the inadequacy is great, the circumstances of unfairness need only be slight to cause this court to set aside the transaction. [Citation.]" *Mimica v. Area Interstate Trucking, Inc.*, 250 Ill. App. 3d 423, 431-32 (1993).

¶ 24                                  i. The Dead-Man's Act

¶ 25    Initially, we note that the parties dispute whether the testimony of Dohrmann and his wife regarding statements allegedly made by Mrs. Rogers about what she received under the

- 6 -

contract is barred under the Dead-Man's Act (the Act). 735 ILCS 5/8-201 (West 2012). The Estate argues that Dohrmann was and is precluded from presenting this evidence by operation of the Dead-Man's Act and that this precise issue was presented to the circuit court, which ruled in 2011 that this particular testimony be stricken under the Dead-Man's Act. Dohrmann, on the other hand, argues that the testimony in question was presented below by the Estate in support of its motion for summary judgment and the Estate, therefore, waived the Dead-Man's Act's protections.

¶ 26    The Dead-Man's Act provides:

> "In the trial of any action in which any party sues or defends as the representative of a deceased person or person under a legal disability, no adverse party or person directly interested in the action shall be allowed to testify on his or her own behalf to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability ***." 735 ILCS 5/8-201 (West 2012).

Only that evidence which the decedent could have refuted is barred by the Act. *Gunn v. Sobucki*, 216 Ill. 2d 602, 609 (2005). The dual purposes of the Act are "to protect decedents' estates from fraudulent claims and to equalize the position of the parties in regard to the giving of testimony. *Gunn*, 216 Ill. 2d at 609.

¶ 27    "It is proper to apply the Dead-Man's Act in the context of a summary judgment proceeding because, while a motion for summary judgment is not a modified trial procedure, it is an adjudication of a claim on the merits and is the procedural equivalent of a trial." *Balma v. Henry*, 404 Ill. App. 3d 233, 238 (2010). " '[I]t strains logic to construe the *** Act in a manner that forces litigants to proceed to trial when it would be evident from an application of the *** Act, in the context of a summary judgment proceeding, that a litigant cannot prove his case.' " *Balma*, 404 Ill. App. 3d at 238 (quoting *Rerack v. Lally*, 241 Ill. App. 3d 692, 694-95 (1992)).

¶ 28    Here, this issue was previously determined by the circuit court in its September 2011 order in which it ruled that this testimony was barred by the Dead-Man's Act. Dohrmann on appeal does not challenge this ruling, but merely reargues this issue as though the ruling does not exist. It does exist, and the testimony in question remains barred under the Dead-Man's Act. Like the circuit court before us, we have disregarded any testimony submitted here that is inconsistent with the order under the Dead-Man's Act.

¶ 29                                  ii. The Consideration Provided

¶ 30    Here, our review of the record persuades us that the trial court did not err in granting summary judgment to the Estate where, based on the record before us, there was no genuine issue of material fact. The circumstances existing when the contract was entered into in this case were such that the terms of the contract should be set aside where the Estate sufficiently showed the contract should be considered void due to the grossly inadequate consideration provided Mrs. Rogers from Dohrmann, as well as the unfair circumstances surrounding the contract's creation.

¶ 31    Under the terms of the contract, Mrs. Rogers agreed to transfer, upon her death, to Dohrmann over $5.5 million in assets in exchange for Dohrmann adding Rogers as an additional middle name to his two sons' names, so that their names became George John

Rogers Dohrmann IV, and Geoffrey Edward David Rogers Dohrmann. We note here that, in his answers to interrogatories, Dohrmann described the consideration bargained for under the contract:

"7. With respect to paragraphs 4 and 7 of the Amended Complaint, and specifically your allegation that you have 'performed all terms and conditions to be performed' by you under the terms of the Contract, identify the following: (a) the 'past and future services' and 'other good and valuable consideration' contemplated under the terms of the Contract; (b) all facts you rely on to support your allegation that you 'performed all terms and conditions to be performed' by you under the terms of the Contract; and (c) all documents pertaining to such allegation.

Answer: The Contract identifies the consideration and the acts to be performed by the parties. Dr. Dohrmann performed by taking actions to change the names of his two sons and incorporate the Rogers name into their legal names in order to continue the Rogers name after the death of Ms. Rogers. Dr. Dohrmann initiated legal proceedings in the Circuit Court of Cook County to change the names of his sons and incorporate the Rogers name into their legal names. On June 22, 2000, George J. Dohrmann IV became legally known as George J. Rogers Dohrmann IV, and Geoffrey Dohrmann became legally known as Geoffrey E. D. Rogers Dohrmann.

There were and are no 'future services' to be performed. At no time prior to the execution of the Contract did Ms. Rogers and Dr. Dohrmann discuss any 'past' services or 'future services' to be performed as part of the Contract.

All documents responsive to this Interrogatory have been produced in Plaintiff's Response to First Set of Document Requests of Defendant Virginia H. Rogers."

Accordingly, therefore, the sole consideration Dohrmann agreed to give in exchange for over $5.5 million in assets was to add Rogers as an additional middle name to his sons' names. According to the plain language of the contract, the addition of 'Rogers' to the boys' names was of value to Mrs. Rogers because it would help the Rogers name to continue after Mrs. Rogers' death. We address that consideration here.

¶ 32    We agree with the Estate that Mrs. Rogers did not gain much by the addition of the Rogers name to the boys' middle names. The stated purpose of adding the name was to "help[ ] the Rogers name to continue after [her] death." However, Dohrmann did not change the boys' surnames to Rogers, nor even exchange their middle names for Rogers. Rather, he merely added the name Rogers as one of two middle names for George IV and one of three middle names for Geoffrey. This can hardly be said to perpetuate the Rogers name after Mrs. Rogers' death.

¶ 33    We note here Dohrmann acknowledges it is appropriate for a court to consider whether consideration was provided in a contract, but argues that it is improper for a court to consider the relative value or adequacy of the consideration. He states: "a court may examine the consideration exchanged for several purposes, none of which, however, includes determining and/or weighing the relative value of adequacy of legal consideration exchanged." We disagree, as, in cases like the one at bar where the consideration provided is so grossly inadequate as to shock the conscience, a court may examine the adequacy of the consideration. See, *e.g.*, *Bonner v. Westbound Records, Inc.*, 76 Ill. App. 3d 736, 743 (1979) ("It is not the function of either the circuit court or [the appellate] court to review the amount of the consideration which passed to decide whether either party made a bad bargain [citations]

*unless the amount is so grossly inadequate* as to shock the conscience of the court." (Emphasis added.)); see also *Ahern*, 202 Ill. App. 3d at 716.

¶ 34 Additionally, the contract is brief and makes no provision for when or even if the boys must actually use the name Rogers. It appears from the record before us that the boys have used the name only intermittently. Moreover, there is nothing in the contract to prevent the boys from legally removing Rogers as a middle name, particularly because they, as minors, were not parties to the contract. Where the consideration for a contract is illusory, the contract will be invalidated for gross inadequacy of consideration. See *Mimica*, 250 Ill. App. 3d at 432. Although the children allegedly took the Rogers name as their own in order to perpetuate the Rogers name after Mrs. Rogers' death, enforcing that obligation is a legal impossibility. Accordingly, the consideration to this contract is illusory.

¶ 35 In total, pursuant to the terms of the contract, Mrs. Rogers, an elderly widow, agreed to give Dohrmann upon her death $5,538,000 in cash and property in exchange for Dohrmann adding Rogers as an additional middle name to the names of his sons in an effort to help perpetuate the Rogers name after Mrs. Rogers' death. The contract does not contain any provision mandating how, when, or whether Dohrmann's sons are to use the Rogers name. The disparity is shocking on its face. We agree with the circuit court, which stated that this consideration "seems to be so minimally beneficial to Mrs. Rogers (particularly in light of the goal stated in the Contract of 'continuing the Rogers name') as to be almost nonexistent, especially when contrasted with the $5.5 million Dr. Dohrmann is to receive under the terms of the Contract."

¶ 36                                     iii. Circumstances of Unfairness

¶ 37 Although the inadequacy of consideration in this situation is sufficient in itself to find this contract void, we also agree with the circuit court and the Estate that there were circumstances of unfairness, that is, the extremely disproportionate bargaining power of the contracting parties, surrounding the execution of the contract to such an extent that the contract could be found void on those grounds, as well. See *Mimica*, 250 Ill. App. 3d at 431-32 ("Where the amount of the consideration which passed is not only so grossly inadequate as to shock the conscience of the court, but also accompanied by circumstances of unfairness, the court is in a position to set aside the transaction. [Citations.] Where the inadequacy is great, the circumstances of unfairness need only be slight to cause this court to set aside the transaction. [Citation.]"). Factors relevant to this analysis include the age and education of the contracting parties. See *Ahern*, 202 Ill. App. 3d at 716 ("Courts will also look to such factors as the age and education of the contracting parties, their commercial experience [citation], and whether the aggrieved party had a meaningful choice when faced with unreasonably unfavorable terms [citations].").

¶ 38 In reviewing the record before us, we have found many of the uncontested facts clearly demonstrate circumstances of unfairness surrounding the execution of the contract, that is, the parties had vastly different bargaining positions. At the time of the contract's execution in 2000, Mrs. Rogers was an 89-year-old widow whose husband had died many years previously. Two years following the execution of this contract, Mrs. Rogers was diagnosed with Alzheimer's disease. She had no children nor any immediate family. She was entering into a contract worth $5.5 million with Dohrmann, a physician. Mrs. Rogers had a long-time attorney

and advisor, Mr. Swaney, but she did not consult him regarding the execution of this contract. She also had in place an estate plan for the event of her death.

¶ 39    The other contracting party, Dohrmann, is a highly educated neurosurgeon, married with a family. Under the contract, Dohrmann stood to reap a benefit worth $5.5 million. Prior to entering into the contract, Dohrmann consulted an estate planning attorney. This attorney drafted a "skeleton" agreement for him. These facts clearly show that the creation of this contract involved gross inadequacy of consideration as well as circumstances of unfairness.

¶ 40    Dohrmann's argument that Mrs. Rogers' motive for entering into the contract is a disputed issue of material fact which precludes summary judgment does not persuade us differently. Dohrmann argues that Mrs. Rogers' actual motive in having the boys legally change their names was "to take on and bear her name as their own, from which she would derive personal satisfaction, pleasure and gratification." This argument, however, is belied by the very language of the contract itself, which states unequivocally that the purpose of entering into the contract was to "help[ ] the Rogers name to continue after my death by incorporating it into your children's names." See *Omintrus Merging Corp. v. Illinois Tool Works, Inc.*, 256 Ill. App. 3d 31, 34 (1993) ("The primary objective in contract construction is to give effect to the intention of the parties ***. If the contract is clear and unambiguous, the judge must determine the intention of the parties solely from the plain language of the contract ***." (Internal quotation marks omitted.)). In addition to the language of the contract itself, Dohrmann admitted in his interrogatory responses in the circuit court that Mrs. Rogers' purpose for entering into the contract was to continue her name after her death. Specifically, as discussed previously, in his verified response to a written interrogatory, Dohrmann answered that he entered into the contract with Mrs. Rogers "in order to continue the Rogers name after the death of Ms. Rogers." Dohrmann's argument after summary judgment was granted that, in fact, Mrs. Rogers' actual motive in entering into the contract and in having the boys legally change their names was "to take on and bear her name as their own, from which she would derive personal satisfaction, pleasure and gratification" strikes us as disingenuous.

¶ 41                              iv. Hearsay Exception

¶ 42    Finally, Dohrmann urges not to consider the evidence of Mrs. Rogers' statements to third parties regarding Mrs. Rogers' suspicions that Dohrmann "was after" her property. Dohrmann argues that these out-of-court statements we offered to prove the matter asserted and, therefore, are inadmissible. The Estate replies that the statements in question are, in fact, admissible under the "state of mind" exception to the hearsay rule. We agree with the Estate.

¶ 43    " 'Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and it is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule.' " *People v. Caffey*, 205 Ill. 2d 52, 88-89 (2001) (quoting *People v. Olinger*, 176 Ill. 2d 326, 357 (1997)). Statements that indicate the declarant's state of mind are admissible as exceptions to the hearsay rule when the declarant is unavailable to testify, there is a reasonable probability that the proffered hearsay statements are truthful, and the statements are relevant to a material issue in the case. *Caffey*, 205 Ill. 2d at 91 (citing *People v. Floyd*, 103 Ill. 2d 541, 546 (1984)). The state of mind exception applies only to the state of mind of the declarant and not the state of mind of someone other than the declarant. *People v. Munoz*, 398 Ill. App. 3d 455, 479 (2010); *People v. Lawler*, 142 Ill. 2d 548, 559 (1991).

¶ 44    Dohrmann's argument here is that these statements are inadmissible hearsay because "the statements are offered to prove that Rogers, in fact, believed what she said she believed." We disagree, as Mrs. Rogers' statements to third parties were not admitted into evidence to prove the matter asserted, that is, that Dohrmann was trying to get property and money from her, but rather to demonstrate that, at the time Mrs. Rogers and Dohrmann entered into the contract in question, Mrs. Rogers had suspicions regarding Dohrmann's motives and would, therefore, have been reluctant to enter into such a contract with him. This demonstration of Mrs. Rogers' state of mind at the time the contract was signed is precisely into the state of mind exception to the hearsay rule. See *Caffey*, 205 Ill. 2d at 91. The circuit court considered this question and found:

> "[T]here are significant circumstances of unfairness surrounding the Contract. The court rejects [Dohrmann's] argument that Mrs. Rogers' suspicions regarding Dr. Dohrmann's motives are inadmissible hearsay. [The Estate is] correct that these are admissible because they are offered to prove Mrs. Rogers' state of mind, and not for the truth of the matter asserted. *Guski v. Raja*, 409 Ill. App. 3d 686, 699-700 (1st Dist. 2011). These statements are being offered to demonstrate that Mrs. Rogers held suspicions toward Dr. Dohrmann, and thus would presumably have been less included to enter into a contract of this nature with him. This is only one of several aspects of this transaction that support [the Estate's] argument about circumstances of unfairness."

We agree with the circuit court, particularly insofar as these statements, admitted as an exception to the hearsay rule, are merely one of the myriad reasons we find that the execution of this contract was surrounded by circumstances of unfairness.

¶ 45    In the instant case, the circuit court properly granted summary judgment in favor of the Estate where there was no genuine issue as to any material fact. The circuit court properly found that the contract was unenforceable.

¶ 46                              III. CONCLUSION
¶ 47    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 48    Affirmed.