2020 IL App (1st) 190970-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
March 10, 2020

No. 1-19-0970

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

---

| | | |
|---|---|---|
| GEORGE J. DOHRMANN, III, | ) | |
| | ) | Appeal from the |
| Plaintiff and Counterdefendant-Appellant and Cross-Appellee, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | |
| | ) | No. 07-L-1602 |
| THOMAS E. SWANEY, not individually but as Independent Executor of the Estate of Virginia H. Rogers, | ) | |
| | ) | The Honorable |
| | ) | Jerry A. Esrig, |
| Defendant and Counterplaintiff-Appellee and Cross-Appellant. | ) | Judge Presiding. |
| | ) | |

---

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1   *Held:*   Counterdefendant's appeal dismissed due to multiple violations of supreme court rules governing form, length, and contents of appellate briefs. On counterplaintiff's cross-appeal, trial court's partial grant of posttrial motion reducing jury's assessment of damages is affirmed.

¶ 2   The plaintiff/counterdefendant, George J. Dohrmann, III, appeals to this court following a jury verdict against him and in favor of the defendant/counterplaintiff, Thomas E. Swaney, not individually but as independent executor of the Estate of Virginia H. Rogers, deceased (Estate), in the Circuit Court of Cook County, on the Estate's second amended counterclaim for fraud. The

Estate cross-appeals the trial court's partial granting of Dohrmann's posttrial motion, reducing the jury's award of damages on the basis that two categories of damages were not sustained by the Estate, but rather were sustained by the Virginia H. Rogers Trust (Trust). For the reasons that follow, we dismiss Dohrmann's appeal. On the Estate's cross-appeal, we affirm the judgment of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4        In *Dohrmann v. Swaney*, 2014 IL App (1st) 131524, this court affirmed the trial court's granting of summary judgment in favor of the Estate on Dohrmann's claim that, on April 1, 2000, Virginia Rogers had executed a written contract in which she agreed to provide in her last will or other testamentary documents that, upon her death, he would receive her apartment in the Drake Tower in Chicago, all of the property within it, and $4 million. At the time the trial court had granted summary judgment in favor of the Estate, it had concurrently denied Dohrmann's motion for summary judgment on the Estate's counterclaim, which alleged that Dohrmann had engaged in fraud in procuring Rogers' execution of the purported contract and in attempting to enforce it through litigation. Upon remand, the cause proceeded on the counterclaim. Following substantial motion practice, a jury trial occurred on the Estate's second amended counterclaim.

¶ 5        The evidence at trial demonstrated that Dohrmann and Rogers met in 1984, as both owned apartments in the Drake Tower, an apartment building on Chicago's Lake Shore Drive. Rogers was then a 73-year-old widow with no children or immediate family, and Dohrmann was a 40-year-old neurosurgeon. Dohrmann and Rogers began to socialize more frequently in the early 1990s. Rogers also got to know Dohrmann's wife, Dr. Helen Dohrmann, and their two young children. Dohrmann and his children would refer to Rogers as the children's "honorary grandmother, or "G.G." (for "Grandma Ginny"). Rogers would give gifts and cards to Dohrmann's

children, although the evidence demonstrated that some of these were purchased by Dohrmann himself. The evidence showed that Rogers at times appreciated the attention from Dohrmann and his family.

¶ 6        In 1998, when Dohrmann was 55 years old and Rogers was 87, Dohrmann met with a lawyer in Chicago to obtain advice about an adult adoption of him by Rogers. The lawyer advised him that he should go to Arkansas to do it. Dohrmann thus traveled to Little Rock, Arkansas, where he met with an attorney named Kaye McLeod. McLeod advised him that he would have to establish residency in Arkansas, so Dohrmann rented an apartment in Arkansas for a year. McLeod informed Dohrmann that she usually represented petitioners in adoption proceedings, which would have been Rogers in that instance. Thus, she needed Rogers to sign a contract engaging McLeod as her attorney. Dohrmann had McLeod send Rogers' letter to his attention, as he was "handling her affairs." In May 1998, McLeod sent a letter to Rogers, care of Dohrmann, but the letter ended up in Rogers' mailbox. According to several witnesses, Rogers found the idea of adopting Dohrmann to be ludicrous, and thereafter she expressed suspicions that Dohrmann was "after my money, and he's after my apartment." There was further testimony by several witnesses that after Rogers received the May 1998 letter from McLeod, she became uncomfortable and upset by the attention she would receive from Dohrmann and his children.

¶ 7        In February 2000, Dohrmann retained an attorney, David Handler, for advice on the legal enforceability of a contract to have property left to someone in a will. Handler's law firm researched the issue, and Handler provided Dohrmann with a "general bare bones agreement." After Handler gave Dohrmann the agreement, he never communicated with Dohrmann again.

¶ 8        That contract at issue in this case was dated April 1, 2000, and it stated in its entirety:

"Agreement

Dear George:

In exchange for your past and future services and other good and valuable consideration (including helping the Rogers name to continue after my death by incorporating it into your children's names), I (Virginia H. Rogers) agree to give you (George J. Dohrmann III) upon my death 1) my apartment in the Drake Tower (shares of 11–East, Drake Tower Apartments, Inc. in Chicago) and all furniture, furnishings, personal effects and other property contained within it and the elevator vestibule at the time of my death 2) the sum of four million dollars ($4,000,000.00), and so will provide in my Last Will and Testament or other testamentary substitute that may take effect upon my death (my 'testamentary documents'). If my testamentary documents fail to provide you with the above, you or your estate, shall have a valid claim against my estate for such amount.

It is my request that you pay my friend and lawyer, Thomas E. Swaney, the sum of one hundred thousand dollars ($100,000.000) as a surprise gift from me.

This agreement may not be amended, modified or canceled except by written agreement signed by you and me. This agreement sets forth our entire agreement and understanding with respect to the matters covered hereby and supersedes all of our prior agreements or understandings with respect to the subject matter hereof. This agreement shall be governed by and construed in accordance with the laws of the State of Illinois applicable to contracts to be performed entirely within such State (determined without regard to choice of law provisions thereof).

If the above correctly sets forth your understanding of our agreement, please indicate your acceptance by signing this agreement in the space provided below. Understood, accepted and agreed on April 1, 2000:

s/ George J. Dohrmann III

Signed on April 1, 2000:

s/ Virginia H. Rogers"

Swaney testified at trial that the signature on the April 1, 2000, contract appeared to be Rogers'.

¶ 9    Dohrmann put the original signed contract in an envelope on which he wrote, "Original copy of 1 April 2000 agreement with VHR/GJD, do not open except on my instructions." It was then stored in a safety deposit box at Dohrmann's bank. For years, Dohrmann did not tell his wife or children about the contract. Later in April 2000, Dohrmann met with another attorney, Jerome Torshen. Torshen advised him to keep anything from that point on relative to Rogers, and Dohrmann kept greeting cards and photographs in a safe deposit box. On October 9, 2001, Dohrmann signed a special durable power of attorney "for the purpose of preserving and collecting a claim for the benefit of myself, my estate, and my children against the Estate of Virginia H. Rogers." Among other things, it gave Torshen the authority to "sue for *** all sums of money that become due or payable from the Estate of Virginia H. Rogers to me, my estate, or my children," and to "commence[ ] legal proceedings at my expense, and in my name."

¶ 10    As set forth above, the consideration recited in the contract was "helping the Rogers name to continue after my death by incorporating it into [Dohrmann's] children's names." On June 22, 2000, the names of Dohrmann's two sons were changed to add "Rogers" as an additional middle name. Swaney testified that at that time, Rogers already had two nephews with the last name of "Rogers," who would continue her husband's family's name.

¶ 11    Swaney testified that at no time did Rogers ever provide in any of her testamentary documents for any bequest to Dohrmann or his family. He testified that he had been her estate-planning attorney for over 25 years, and he described her as a careful and conscientious planner of her estate.

Her plan was to leave the majority of her wealth to several charities, as well as cash bequests to several close friends, with no bequest being larger than $100,000. Swaney provided extensive testimony about the amendments that Rogers had made to her estate planning documents over the years, both before and after April 1, 2000. He testified that she never made any significant financial commitment or change to her estate plan without consulting him. He testified that he was never consulted or told by her about a purported agreement on April 1, 2000, to leave a sizeable bequest to Dohrmann. In approximately 2002, Rogers was diagnosed with Alzheimer's disease.

¶ 12     The testimony showed that Dohrmann learned sometime prior to January 5, 2007, that Rogers had transferred her apartment to the Trust. On that date, attorney Henry Novoselsky, representing Dohrmann, had a telephone conversation with Swaney concerning the April 1, 2000, contract and Dohrmann's concern that Rogers' actions had breached the contract. Swaney testified that this conversation was the first time that he became aware of the April 1, 2000, contract. Swaney testified that he met with Rogers, who did not dispute that the signature was hers but disputed that she had signed the purported contract. She told Swaney she wanted to do whatever could be done to make the contract "null and void." Swaney also testified that when lawyers from Swaney's law firm conducted a search of Rogers' apartment and storage, they did not find a copy of the purported contract or any written materials pertaining to it.

¶ 13     On February 13, 2007, Dohrmann, though Novoselsky, filed a lawsuit against Rogers for breach of the April 1, 2000, contract. Rogers was represented in the lawsuit by Swaney's law firm, Sidley Austin. The litigation was extensively detailed in the trial testimony. It continued for over six years, culminating in this court's July 24, 2014, denial of Dohrmann's petition for rehearing following the issuance of our opinion affirming summary judgment in favor of the Estate. See *Dohrmann*, 2014 IL App (1st) 131524, ¶ 45. The jury was instructed that the court had already

determined that the contract was unenforceable and found that its creation involved gross inadequacy of consideration as well as circumstances of unfairness. See *id.* ¶ 30.

¶ 14        Rogers died on January 1, 2013, at the age of 101. Thereafter Swaney, who was the executor of Rogers' estate, was substituted as a party in her place.[1] Swaney testified that the Estate was seeking three categories of damages on the counterclaim. The first category of damages included the legal fees and expenses that the Estate had spent in defending against Dohrmann's lawsuit seeking to enforce the contract of April 1, 2000. Swaney testified extensively to the bills that Rogers and the Estate had incurred from Sidley Austin in defending against the litigation. He testified that the bills were paid. He testified that the bills were reasonable for the work that had to be done. He testified that the total legal expenses incurred by the Estate in defending against Dohrmann's lawsuit was $1,848,298.26. The trial court instructed the jury that it could award these legal expenses as damages if it determined by clear and convincing evidence that Dohrmann's fraud scheme contemplated pursuing a claim against Rogers or her Estate.

¶ 15        The second category of damages sought by the Estate was for lost investment earnings. Swaney testified that, when Rogers died in January 2013, as executor of her Estate and trustee of her Trust, he segregated a sufficient amount of assets to pay a judgment in the event this court reversed summary judgment and Dohrmann prevailed in his lawsuit to enforce the contract. To preserve these segregated funds, he invested them in short-term, risk-free treasury bonds and certificates of deposit. He did the same with the proceeds of the sales of the apartment and its contents when those sold. The remainder of the assets were invested in a portfolio of common stocks and bonds appropriate for the Trust's beneficiaries, which were charitable institutions. He

---

[1] On March 12, 2008, Arthur Leckner was appointed as plenary guardian of Rogers' estate due to her Alzheimer's disease and moderate dementia. On May 25, 2010, Swaney was substituted as guardian in place of Leckner.

kept these funds segregated through September 2014, when this court's judgment became final. He testified that the total lost investment returns on the segregated assets, compared to the remainder that were invested in common stocks and bonds, totaled $348,379.87. These assets were owned by the Trust, not by the Estate.

¶ 16 The third category of damages sought by the Estate was for costs incurred after Rogers' death due to the fact that initially, her apartment could not be sold while Dohrmann's lawsuit was pending because the possibility existed that it could have to be turned over to him. Swaney testified that he ultimately obtained Dohrmann's agreement for the apartment to be sold and for his claim to apply to the proceeds of the sale. Swaney testified that assessments, insurance, gas bills, and the like had to be paid until such time that the agreement with Dohrmann was in place and the apartment could be sold. The apartment was owned by the Trust during this time. The damages claimed by the Estate for this category were $20,484.10.

¶ 17 At the close of evidence, the trial court denied Dohrmann's motion for a directed verdict. The jury returned a verdict in favor of the Estate on the counterclaim for fraud, assessing damages in the amount of $2,217.662.23. This sum was the full amount requested by the Estate for all three categories of damages.

¶ 18 Dohrmann filed a posttrial motion. The trial court granted this motion in part, concluding that the second and third categories of damages sought by the Estate were actually incurred by the Trust, not the Estate. Thus, the trial court reduced the jury's award of damages by $369,323.97, which was the total of the second and third categories of damages sought. The trial court denied the rest of the relief sought in the posttrial motion and entered judgment on the verdict in the remaining amount of $1,848.298.26. Dohrmann filed a timely notice of appeal. The Estate filed a cross-appeal of the courts' order reducing the amount of damages.

¶ 19                                    II. ANALYSIS

¶ 20                                 1. Dohrmann's Appeal

¶ 21        In Dohrmann's appeal, he has sought to raise the following 18 issues: (1) the Estate's ability to recover attorney fees as an element of damages; (2) the denial of his two motions for summary judgment and his motion to reconsider the denial of those; (3) the allowance of testimony by Swaney that Dohrmann contends contradicted admissions by the Estate; (4) the exclusion of testimony under the Dead Man's Act (735 ILCS 5/8-201 (West 2018)); (5) the denial of his motion *in limine* concerning the cause of the Estate's damages; (6) the denial of his motion *in limine* concerning the Estate's attorney fees being damages; (7) the denial of his motion *in limine* to bar the Estate from presenting evidence of the proposed adult adoption; (8) the denial of his motion *in limine* concerning punitive damages; (9) the granting the Estate's motion *in limine* to allow evidence of statements by Rogers that he contends were hearsay; (10) the rulings on two motions *in limine* concerning evidence of the previous granting of summary judgment; (11) the barring of his expert witness; (12) the admission of certain testimony in violation of the attorney-client privilege; (13) the restriction on his cross-examination of Swaney about the Illinois Rules of Professional Conduct; (14) the trial court's misstatement of the burden of proof during jury selection; (15) various errors in the jury instructions; (16) the denial of his motion for directed verdict; (17) whether each version of the Estate's amended counterclaims stated a valid cause of action for fraud; and (18) whether the Estate's original counterclaim should have been dismissed as moot.

¶ 22        It is clear to this court that one reason Dohrmann was able to raise all of these issues in his appeal was because his appellant's brief violates numerous requirements of the Illinois Supreme Court Rules governing the form, length, and required contents of briefs filed in this court. Rule

341(a) requires that the text of an appellate brief, excluding headings, quotations, and footnotes, "must be double-spaced." Ill. S. Ct. R. 341(a) (eff. May 25, 2018). It also states that "[c]ondensed type is prohibited." *Id.* It is obvious to this court, which reviews an innumerable number of briefs that comply with these provisions of Rule 341(a), that Dohrmann's opening brief violates them. The text of his brief is vertically condensed and not double-spaced. By improperly condensing the text of his brief in this way, Dohrmann has been able to fit more facts and arguments into a 50-page brief than a party who complied with the rules would be able to do. By our count, the substantive portions of Dohrmann's brief contain over 17,600 words. This far exceeds the 15,000-word limit for an appellant's brief that Rule 341(b) provides as an alternative to the 50-page limit.[2] Ill. S. Ct. R. 341(b)(1) (eff. May 25, 2018). We note that Dohrmann did not seek leave of court to file a brief in excess of the length limitations of the rule.

¶ 23    The rules of procedure governing appellate briefs are rules, not suggestions. *Venturella v. Dreyfuss*, 2017 IL App (1st) 160565, ¶ 23. As with other supreme court rules, they have the force of law, and the presumption must be that they will be obeyed and enforced. See *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 494 (2002). Adherence to length limitations for briefs is not an inconsequential matter. *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 14-15 (1995). Parties who ignore the length limitations set forth in Rule 341 "do so at their peril." *Wright v. County of DuPage*, 316 Ill. App. 3d 28, 36 (2000). We are well aware that attorneys and parties, in order to comply with the requirements for page limits, word limits, typeface, and spacing, often have to prioritize their appellate arguments and sacrifice some of the points, arguments, or issues that they might prefer to raise on appeal. Doing this can be a challenging and time-consuming task. If we

---

[2] The committee comments to paragraph (b) of Supreme Court Rule 341 indicate that the alternative word limitation for the length of briefs is based on "a uniform assumption of 300 words per page." Ill. S. Ct. R. 341, Committee Comments (rev. Sept. 15, 2017). Thus, if he had used proper spacing, the length of Dohrmann's 17,600-word brief would be 59 pages.

overlook a party's violation of these requirements, we allow that party an unfair advantage over parties who comply with this rule. Ignoring violations provides parties with no incentive to comply with our rules. It is within our authority to strike Dohrmann's brief and dismiss this appeal based on his noncompliance with these length limitations. *Epstein v. Galuska*, 362 Ill. App. 3d 36, 42 (2005).

¶ 24    However, this is not the only violation of the supreme court rules by which Dohrmann has sought to squeeze more points into his opening brief. His brief also wholly violates the requirement that an appellant's brief include an "Argument" section "which *shall contain* the contentions of the appellant and the reasons therefor, *with citation of* the authorities and *the pages of the record relied on*." (Emphasis added.) Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). Apart from minimal references to trial exhibits, the Argument section of Dohrmann's brief does not include a single citation to any page of the record Dohrmann relies on to support his arguments. And this is not a case in which the record on appeal is insubstantial. It consists of approximately 2,912 pages of the common law record, 2,440 pages of the transcripts of proceedings (which included a five-day jury trial), and 2,675 pages of trial exhibits.[3]

¶ 25    We have said many times that the appellate court " 'is not a depository in which an appellant may dump its arguments without factual foundation in hopes that [the court] will sift through the entire record to find support for a determination favorable to appellant's position.' " (Brackets in original.) *Mikrut v. First Bank of Oak Park*, 359 Ill. App. 3d 37, 51 (2005) (quoting *Coffey v.*

---

[3] Dohrmann's brief also violates the requirement of Supreme Court Rule 342 (eff. July 1, 2017), that it attach an appendix that includes a complete table of contents of the record on appeal setting forth "the names of all witnesses and the pages on which their direct examination, cross examination, and redirect examination begin." While his appendix does include a table of contents stating some of the information required by Rule 342, its omission of any information about the trial witnesses and the pages on which their examinations begin further added to the difficulty that this court has encountered in reviewing the trial record in this case.

*Hancock*, 122 Ill. App. 3d 442, 444 (1984)); *Engle v. Foley & Lardner, LLP*, 393 Ill. App. 3d 838, 854 (2009). "It is not the responsibility of this court to scour the record in search of facts that support the arguments being advanced by a party." *Travaglini v. Ingalls Health System*, 396 Ill. App. 3d 387, 405 (2009). "Strict adherence to the requirement of citing the relevant pages of the record is necessary to expedite and facilitate the administration of justice." *Lake Point Tower Garage Ass'n v. Property Tax Appeal Board*, 346 Ill. App. 3d 389, 397 (2004). The need for the parties to assist in expediting and facilitating our review of an appeal is especially important where, as here, the appellant is asking the court to review 18 different legal issues involving the review of thousands of pages of record in litigation that has been pending for well over a decade. The citation of pages in conjunction with an appellant's arguments is important because it allows this court to confirm that the arguments pressed on appeal were first presented to the trial court and that proper objections were made to preserve appellate review of the issue. Arguments that fail to comply with this requirement do not merit consideration and may be rejected for this reason. *Id.* An appeal may be dismissed for failure to comply with this requirement. *Oruta v. B.E.W. & Continental*, 2016 IL App (1st) 152735, ¶¶ 34-36.

¶ 26 While we appreciate the fact that Dohrmann's reply brief acknowledges this shortcoming in his opening brief, the failure to cite pages of the record in conjunction with his argument has nevertheless made our review of many of the issues he raises difficult if not impossible. For example, one of Dohrmann's arguments is that the trial court erred by allowing Swaney to testify at trial as to the cause of the Estate's alleged damages that was inconsistent with the Estate's admissions in response to a request under Illinois Supreme Court Rule 216 (eff. July 1, 2014). Swaney's testimony spans about 280 pages of the record, yet Dohrmann's brief does not cite the pages of the record where the testimony about which he complains may be found. Likewise,

Dohrmann's brief never cites the record where the relevant Rule 216 admissions may be found. Moreover, Dohrmann's brief fails to cite what specific testimony he contends contradicted an admission by the Estate, and it does not identify any specific Rule 216 admission he relies upon. This court is entitled to have issues clearly defined by the parties, and it not the function or obligation of this court to act as an advocate or search the record for error. *Atlas v. Mayer Hoffman McCann, P.C.*, 2019 IL App (1st) 180939, ¶ 33.

¶ 27 Another example is Dohrmann's argument that the Estate "opened the door" to testimony by Dohrmann and his wife otherwise barred by the Dead Man's Act (735 ILCS 5/8-201 (West 2018)) by introducing "the testimony of various witnesses about the event and their conversation with Mrs. Rogers." Again, Dohrmann's brief does not direct our attention to any specific testimony that he contends "opened the door," or to the pages of the record where the testimony complained of may be found. It is not the place of this court to guess what testimony he is referring to, search the record for reasons to reverse, or make his argument for him.

¶ 28 The example that was the most frustrating to this court involved Dohrmann's argument that the trial court erred in denying his motion for a directed verdict. This involved a six-page discussion of why the trial evidence satisfied the standard for directed verdict. See *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). However, there was absolutely no citation to the pages of the record where the evidence relied upon may be found. Deciding this issue would essentially require us to "scour the record in search of facts that support the arguments being advanced," and it is not our responsibility to do this. *Travaglini*, 396 Ill. App. 3d at 405.

¶ 29 Also, Dohrmann argued to us that the trial court erred in refusing to give six of his proposed jury instructions that he contends "would have correctly instructed the jury that a plaintiff must prove the claim of fraud by clear and convincing evidence." However, there is no citation to the

pages in the record where these tendered instructions may be found, and we did not find them in our review of the record. It was Dohrmann's responsibility as the appellant seeking review of the issue to ensure that these proposed instructions were included in the record on appeal, and in the absence of an adequate record we would be unable to review the issue in any event. *Nika v. Danz*, 199 Ill. App. 3d 296, 310 (1990). Our point here, though, is that if the pages of the record had been cited in conjunction with this argument, it probably would have been discovered that these proposed jury instructions were missing so that this problem could have been remedied.

¶ 30     Finally, Dohrmann's brief also raised several issues in which he failed to articulate a legal argument or cite authority in support of his argument, which is an additional violation Rule 347(h)(7). We could cite a number of arguments supported by only one or two sentences of discussion without citation to authority. The most glaring example involved his argument that the trial court erred in baring his expert witness, Sanford Finkel, M.D., who would have given the medical opinion that Rogers had "executed the April 1, 2000 contract but had forgotten it." The trial court determined that Dr. Finkel's opinions were inadmissible because the evidentiary basis for his opinions was evidence that would be barred under the Dead Man's Act. See *Estate of Justus v. Justus*, 243 Ill. App. 3d 737, 740-41 (1993). Dohrmann's brief cites no legal authority for the contention that this was error, and it makes no legal argument that actually addresses this reasoning by the trial court. The entirety of Dohrmann's argument states:

> "This [opinion expressed by Dr. Finkel] was a scenario supported by the evidence and argued to the jury, but the jury was deprived of Dr. Finkel's expert testimony supporting the conclusion. Dr. Finkel's reliance on matter not admissible in evidence does not make his opinions inadmissible. Illinois Rule[ ] of Evidence *** 703 [(eff. Jan. 1, 2011)]."

This argument wholly fails to articulate any legal reasoning in support of the contention that

evidence barred by the Dead Man's Act is nevertheless within the scope of inadmissible evidence upon which an expert may rely as a basis for an opinion under Rule 703. "A court of review is entitled to have the issues clearly defined and to be cited *pertinent* authority." (Emphasis in original.) *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises*, 2013 IL 115106, ¶ 56. "An issue that is merely listed or included in a vague allegation of error is not 'argued' and will not satisfy the requirements of the rule." *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010). It is well settled that a contention that is supported by some argument but does not cite any authority does not satisfy the requirements of Rule 347(h)(7), and bare contentions that fail to cite any authority do not merit consideration on appeal. *Bank of America, N.A. v. Kulesza*, 2014 IL App (1st) 132075, ¶ 18.

¶ 31    Ultimately, we find no compelling reason in this case to excuse or overlook the numerous violations of Rule 341 by Dohrmann. He has violated the rule on length limitations of briefs to seek review of 18 different legal issues, while simultaneously impeding our ability to review these issues by wholly failing to cite the pages of the record he relies on in conjunction with his argument and, in multiple instances, by stating nothing more than bare contentions that fail to articulate an argument or cite pertinent legal authority. For these reasons, we dismiss Dohrmann's appeal for his failure to comply with the supreme court rules.[4]

---

[4] In addition to his violation of supreme court rules, we note that Dohrmann seeks review of several orders that are normally interlocutory and not appealable. He seeks to appeal the trial court's denial of two of his motions for summary judgment and his motion to reconsider the same. However, he fails to address any reason why we should not follow the familiar rule that when a case proceeds to trial after the denial of a summary judgment motion, the order denying the motion for summary judgment merges with the judgment and is not appealable. *Wheeler Financial, Inc. v. Law Bulletin Publishing Co.*, 2018 IL App (1st) 171495, ¶ 66. Also, he seeks to appeal the trial court's granting or denial of various motions *in limine* without also appealing the trial court's corresponding ruling admitting the allegedly objectionable testimony at trial. See *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 163 Ill. 2d 498, 502 (1994) ("the law is well established that the denial of a motion *in limine* does not preserve an objection to disputed evidence later introduced at trial").

¶ 32                                    2. Estate's Cross-Appeal

¶ 33        On its cross-appeal, the Estate argues that the trial court erred in partially granting Dohrmann's posttrial motion and reducing the jury's assessment of damages by $369,323.97. This sum was the total of two categories of damages sought by the Estate. The first category was for lost investment earnings between the date of Rogers' death and the date that the judgment on Dohrmann's claim became final. During this time, Swaney, who was both executor and trustee, segregated sufficient assets owned by the Trust to pay a potential judgment against the Estate in the event that this court reversed summary judgment and Dohrmann ultimately prevailed in his claim to enforce the contract. To preserve this capital, he invested the segregated funds in risk-free instruments. These experienced a lower rate of return during that time than the remaining assets that Swaney invested in a portfolio of common stocks and bonds appropriate for the Trust's beneficiaries, which were charitable institutions. The second category of damages were the carrying costs that the Trust paid on Rogers' apartment for the period of time between her death and the date that it could be sold, once Dohrmann agreed that, if this court reversed and he was ultimately successful on his claim, it could be satisfied from the proceeds of a sale instead of through transfer of the apartment itself. Swaney testified that until such agreement with Dohrmann was in place, the apartment could not be sold because the possibility existed that it would have to be turned over to Dohrmann if he prevailed in his contract claim.

¶ 34        In partially granting Dohrmann's posttrial motion, the trial court ruled that these two categories of damages were not recoverable by the Estate. The trial court reasoned that the Estate and the Trust were separate legal entities, and the assets involved in these two categories of damages were property of the Trust and not of the Estate. The Trust, not the Estate, was therefore the entity that had lost investment earnings and paid the carrying costs on the apartment. The trial

court accepted that, if this court had reversed summary judgment and Dohrmann had ultimately succeeded in his contract claim, Dohrmann could have reached the assets of the Trust to satisfy a judgment against the Estate. However, the court found that this concept only supported the conclusion that the Trust had a claim against Dohrmann for damages, not that the Estate could assert this claim on behalf of the Trust. The trial court also cited the fact that the Estate's attorneys had sought leave in 2015 to add Swaney in his capacity as trustee of the Trust as a counterplaintiff, which the motion judge had denied on September 27, 2016. In the hearing on the posttrial motion, the trial judge stated that the motion judge's reasoning for denying leave had been that Swaney's involvement in the case as both trustee and executor "obfuscates the matters at issue in this case and creates sort of a fiction that they are one in the same, but they are not. Each has their own roles, their own responsibilities, and their own rights, the trustee to the [T]rust and the executor to the Estate of Virginia Rogers."

¶ 35    It is undisputed that the Trust is its own legal entity, distinct from the Estate. *Sullivan v. Kodsi*, 359 Ill. App. 3d 1005, 1010 (2005). The Trust had the power to sue or be sued through its trustee. *Id.* In this case, the Estate argues that it should have the right to recover damages involving assets owned by and expenditures of the Trust. The Estate reasons that the Trust itself was not a victim of Dohrmann's fraud, and therefore it lacked standing to pursue a fraud claim against Dohrmann. Thus, according to the Estate, as Rogers (and later her Estate) were the only proper counterplaintiffs, they must be entitled to recover all damages flowing from the fraudulent conduct, notwithstanding that the assets affected were owned by the Trust.

¶ 36    We do not necessarily accept the Estate's argument that the Trust could not have pursued its own claim for damages against Dohrmann. It is evident from the record that the Estate's attorneys tried at some point to add Swaney, in his capacity as trustee of the Trust, as a counterplaintiff to

pursue damages incurred by the Trust. However, neither party adequately provides us with an understanding of why this claim was not allowed to proceed, and the record is unclear. The Estate does not appeal the trial court's order denying it leave to pursue this claim. The record reflects that Dohrmann's third amended complaint, filed January 7, 2009, named the Trust as a defendant in his contract claim. The record also contains an amended counterclaim, bearing a file-stamp of May 20, 2015, in which Swaney as trustee of the Trust is named as a counterplaintiff. That amended counterclaim alleges that the Trust suffered damages in that Rogers had conveyed virtually all her property to the Trust by the time Dohrmann's lawsuit was filed. According to the parties and the trial court, leave was never given to file this amended counterclaim adding the Trust as a counterplaintiff. Neither party directs our attention in the record to a motion seeking leave to file this amended counterclaim, a response to such motion, the order denying leave entered September 27, 2016, or the transcript of such hearing. The second amended counterclaim, filed February 8, 2018, does not name Swaney in his capacity as trustee of the Trust as counterplaintiff, nor does it include the allegations of the amended complaint that the Trust sustained damages.

¶ 37　　Thus, it is unclear to this court why the trial court denied leave to file the amended counterclaim adding Swaney in his capacity as trustee of the Trust as counterplaintiff when the Estate attempted to do this. As the Estate does not argue in its cross-appeal that the trial court erred in denying such leave, we are unable to address whether the Trust had a cause of action for fraud against Dohrmann by which it could have pursued recovery of damages it incurred.

¶ 38　　The Estate cites us no law expressly authorizing a decedent's estate to recover as tort damages lost investment returns on assets owned by the decedent's revocable trust or expenditures made by such a trust. Instead, the Estate relies upon the fact that Rogers established a unified estate plan in which certain debts of or claims against the Estate could be satisfied with assets of the Trust. It

points out that Rogers' will gave her executor the power "to compromise, contest, prosecute or abandon claims or other charges in favor of or against my estate" and directed the executor to "pay out of the residue of my estate *** other proper charges against my estate." Her will further stated, "If, however, the cash and readily marketable assets in my residuary estate are insufficient to make the foregoing payments in full, the Executors shall notify the Trustee of the [T]rust *** of the amount of the insufficiency and request payment thereof." The Trust's declaration of trust contained a corresponding provision stating, "To the extent that, in the judgment of the Trustee, the assets of my probate estate not required for satisfaction of any pre-residuary legacy are insufficient, the Trustee shall pay out of that portion of the Trust that would otherwise pass under paragraph 2.5 of Article 2 *** other proper charges against my estate, either by making such payments directly or by making distributions to the personal representative of my estate for such purposes. *** The Trustee may rely on the personal representative's written statements as the amounts needed for such purposes."

¶ 39      We disagree that these provisions entitle the Estate to recover damages for losses sustained by the Trust. Although we certainly find that Swaney acted prudently under these provisions by segregating certain Trust assets to satisfy a potential judgment against the Estate and by refraining from selling Rogers' apartment until an agreement could be reached with Dohrmann, the fact remains that his actions involved assets of the Trust. The fact that these were assets of the Trust meant that they had more protection from the Estate's creditors than they would have had if they had been assets held by the Estate. See *Hanley v. Kusper*, 61 Ill. 2d 452, 461 (1975). If this court had reversed and Dohrmann had obtained a judgment against the Estate, Dohrmann would not have been automatically entitled to satisfy that judgment from Trust assets without some legal proceedings directed against the Trust. See *Matthews v. Serafin*, 319 Ill. App. 3d 72, 78 (2001).

Because the law treats these assets differently on the basis that they were held in a trust, we cannot in this context equate the losses of the Estate with the losses of the Trust. It was incumbent that the Trust pursue recovery of these damages in its own claim.

¶ 40　　　　The Estate argues that the Trust should be considered a "collateral source" in which Rogers held her assets, and the collateral source rule should prevent Dohrmann from gaining any windfall from the fact that Rogers kept her wealth in a revocable trust. " 'Under the collateral source rule, benefits received by the injured party from a source wholly independent of, and collateral to, the tortfeasor will not diminish damages otherwise recoverable from the tortfeasor.' " *Arthur v. Catour*, 216 Ill. 2d 72, 78 (2005) (quoting *Wilson v. The Hoffman Group, Inc.*, 131 Ill. 2d 308, 320 (1989)). It "protects collateral payments made to or benefits conferred on the plaintiff by denying the defendant any correspondent offset or credit." *Arthur*, 216 Ill. 2d at 78. The justification for the rule is that the wrongdoer should not benefit from the expenditures made by the injured party or take advantage of contracts or other relations that may exist between the injured party and third persons. *Id.* at 79. The rule is most commonly applied when an injured plaintiff becomes responsible to pay medical expenses because of a defendant's negligence, and the damages are not reduced by the fact that the plaintiff is insured. See *id.*

¶ 41　　　　We find that the collateral source rule has no application on these facts. Here, the lost investment returns experienced by the Trust and the apartment carrying costs paid by the Trust were not "benefits received by" or "payments made to" the Estate. Although the carrying costs on the apartment did involve expenditures by the Trust, it was not shown that the Estate would have incurred or become legally responsible for paying these carrying costs absent some contract or other relationship with the Trust. As discussed above, these losses involved assets of the Trust, and they cannot be recovered as damages by the Estate.

¶ 42                                    III. CONCLUSION

¶ 43        The appeal by Dohrmann is dismissed for failure to comply with Illinois Supreme Court

Rules as discussed above. On the Estate's cross-appeal, we affirm the trial court's partial granting

of Dohrmann's posttrial motion.

¶ 44        Dohrmann's appeal dismissed.

¶ 45        Estate's cross-appeal affirmed.